Donald Eugene LAMBERT,
Petitioner–Appellee,

v.

James BLODGETT, Respondent–
Appellant.

Donald Eugene Lambert, Petitioner–
Appellant,

v.

James Blodgett, Respondent–Appellee.

Nos. 03–35081, 03–35092.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 2004.

Filed Dec. 28, 2004.

946

Paul Douglas Weisser and John Joseph Samson, Office of the Washington Attor-ney General, Olympia, WA, for the appel-lant and cross-appellee James Blodgett.

Patricia J. Arthur, Columbia Legal Ser-vices, Seattle, Washington; Nancy D. Tenney and Laura Mate, Federal Public Defender's Office, Seattle, WA, for the ap-pellee and cross-appellant Donald Eugene Lambert.

Before: O'SCANNLAIN, RYMER, and BYBEE, Circuit Judges.

BYBEE, Circuit Judge:

This case requires us to interpret and apply the standard of review mandated by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), and to de-termine the meaning of the phrase "adju-dicated on the merits," which acts as a prerequisite to AEDPA review.

In Washington state court, on December 10, 1997, fifteen-year-old Donald Eugene Lambert pled guilty to aggravated first-degree murder, an offense which carries a mandatory sentence of life in prison with-out the possibility of parole. Shortly thereafter, Lambert filed a Personal Re-straint Petition in the Washington Court of Appeals attacking his plea on the grounds that he was provided ineffective assistance of counsel and the plea was not knowingly, voluntarily and intelligently entered. Af-ter unsuccessfully arguing his claims both in the Court of Appeals and the Washing-ton Supreme Court, Lambert petitioned the United States District Court for the Western District of Washington for a writ of habeas corpus.

In his habeas petition, Lambert reasserted his claim of ineffective assistance supported by three primary allegations: (1) his attorney, Guillermo Romero, stipulated to the juvenile court's declination of jurisdiction and transfer to adult court; (2) Romero failed to fully advise him of the penalty he would face if he pled guilty, failed to advise him that he should not plead guilty because he would receive the same sentence if he were convicted after a trial, and failed to investigate certain impeachment evidence; and (3) Romero labored under an actual conflict of interest created by his association with an indigent defense firm that was also representing Lambert's co-defendant. Lambert also reasserted the allegation that his guilty plea was not knowing, voluntary and intelligent because he was unaware that the sentence set forth in his plea agreement—life in prison without the possibility of parole—truly meant that he would never be released. The district court granted relief on his ineffective assistance of counsel claim, finding persuasive Lambert's second allegation, that Romero failed to investigate the government's case and advise Lambert prior to the entry of his plea. The district court 17318 also concluded that Lambert was entitled to habeas relief on the ground that his plea was not knowing, voluntary and intelligent because he was unaware of the punishment he would face. The state of Washington, through Warden James Blodgett, appeals the grounds on which the district court granted relief, and Lambert cross-appeals the issues on which he was denied relief.

Because we conclude that the district court erroneously disregarded the Washington state courts' factual findings and conclusions of law, we reverse the district court's decision granting habeas relief on the ground that Lambert was denied the effective assistance of counsel and his plea was not knowing, voluntary and intelligent. We otherwise affirm.

## I. BACKGROUND

### A. Facts

In the early morning hours of May 21, 1997, 89-year-old Homer Smithson and his elderly wife, Vada Smithson, were abruptly awakened by two armed teenage intruders who entered the bedroom of their rural home in Grant County, Washington, shouting expletives. As the teens repeatedly and fatally shot Homer in the couple's bed, Vada—in an effort to telephone her son for help—ran into the kitchen. The two teens ran outside to reload their firearms with ammunition they had stolen from a shed on the Smithsons' property. Entering the house a second time, the teens concentrated their fire on Mrs. Smithson. After emptying their weapons again, the teens exited the house to reload once more. Through the kitchen window, one of the teens noticed Vada Smithson on the telephone and heard her exclaim, "they're killing me, they're killing me!" Believing she was calling the police, the teen shot her multiple times, firing six or seven rounds until the gun was empty.

Police detectives from the Grant County Sheriff's Office responded to the scene. They found Homer Smithson in bed, still alive but semi-conscious, thrashing around. He died at the Sacred Heart Hospital in Spokane, Washington shortly thereafter, having sustained multiple gunshot wounds to the head, chest, legs and abdomen. Vada Smithson was found dead in her kitchen, holding the handset of a telephone. She appeared to have been shot multiple times, and lost large quantities of blood. According to detectives, the house had not been ransacked, but numerous .22 cartridge casings were found at the scene.

Investigation later that day led police to the home of Marcus Wawers, where they found the murder weapons. Police questioned 15–year–old Melanie Hinkle, who was then residing at the Wawers's residence. Hinkle disclosed a plan to rob and kill the Smithsons that she and three other teens, including Wawers, age 15, Adam Betancourt, age 16, and 15–year–old Donald Eugene Lambert, had devised over the course of two weeks. Hinkle said that the plan on the evening of May 20 was for Lambert, Wawers and Betancourt to shoot Homer Smithson and then hold a gun to Mrs. Smithson's head, forcing her to tell them where the valuables were in the house. After she had done so, they planned to shoot Mrs. Smithson as well. Hinkle said that she had intended to accompany the boys that evening, but was unable to after she injured her leg. In her sworn statement she reported that, in connection with the plan to rob the Smithsons, Lambert had expressed the possibility that Mr. and Mrs. Smithson might both be killed, stating, "whatever happens, happens."

The Grant County Sheriff's Office interviewed Lambert regarding his whereabouts on the evening of the murders. After waiving his *Miranda* rights, Lambert initially denied any involvement in the murders, claiming to have been at Wawers's home the entire evening. He did acknowledge knowing Homer Smithson, reporting that he used to live on the Smithsons' sod farm.

Later in the interview, however, Lambert confessed his involvement in the crimes. He stated that he, Wawers and Betancourt went to the Smithsons' home that evening to rob them. The three proceeded first to the Smithsons' shed, stealing approximately 35 rounds of ammunition. Lambert initially carried a nine shot .22 revolver, Betancourt carried a single shot rifle, and Wawers planned to stand watch over the robbery with a pellet gun. Betancourt and Lambert subsequently traded guns, and the two entered the Smithsons' home. After hearing Mr. Smithson coughing, Lambert and Betancourt followed the sound to the bedroom and opened fire. Once they had depleted their ammunition, the two ran outside, traded weapons again, and reloaded. After entering, firing and exiting a second time, Lambert, overhearing Vada Smithson's panicked phone call, then shot six or seven bullets at her through the kitchen window. According to Lambert, Betancourt then joined in, shooting her in the head. Following the shootings, the three boys ran from the Smithsons' property back toward Wawers's residence. According to Lambert, before reaching the home, Betancourt recalled leaving his flashlight in the Smithsons' shed, and he returned to the scene to retrieve it. Betancourt later reported to Lambert that, upon his return, he found Vada Smithson still alive, and he stabbed her with his knife. In retrospect, Lambert recalled thinking that the plan was "all a game, like we were just gonna jack whatever, rob whatever and then leave."

On May 22, 1997, Lambert was arraigned in juvenile court in Grant County on two counts of aggravated first-degree murder for the deaths of Homer and Vada Smithson. The Grant County Superior Court appointed attorney Guillermo Romero to represent Lambert. Romero was associated with The Defenders, an indigent defense firm which contracted with Grant County to provide legal services. Thomas Earl, another attorney associated with The Defenders, was appointed to represent Betancourt. Hinkle was represented by yet another attorney associated with The Defenders, while Wawers retained private counsel. All four youths were charged with two counts of aggravated first-degree

murder. Sixteen-year-old Betancourt was directly charged in Superior Court. He subsequently pled guilty to two counts of non-aggravated first-degree murder and agreed to testify in hearings pertaining to Lambert, Hinkle and Wawers.[1] The other three defendants, Lambert (15), Wawers (15), and Hinkle (15), were initially charged in juvenile court, but the State immediately petitioned the juvenile court to decline jurisdiction and transfer the case to Superior Court. In preparation for the hearing on this motion, Romero retained Dr. Mark Mays, a psychologist and attorney, to conduct a psychological evaluation of Lambert. Dr. Mays's report concluded that Lambert was extremely dangerous and had no mental problems. Through his attorney, Lambert stipulated to the transfer of his case from juvenile to adult court, conceding that no mitigating factors favored retaining juvenile jurisdiction. The juvenile court declined jurisdiction and transferred Lambert's case to adult court on July 22, 1997.

That same day, Lambert was charged as an adult on two counts of aggravated first-degree murder in Grant County Superior Court. Lambert entered a plea of not guilty. In preparation for trial, Lambert submitted to an interview with the Washington Department of Social and Health Services for the purpose of assessing his competency to stand trial, his capacity at the time of the alleged offense, and his dangerousness. During this interview, Lambert stated, "[I]t's not right to go and kill somebody but I can't take it back. I guess I should go to prison, take classes, work to be a better person when I get out."[2] His interviewers concluded that

Lambert was "well acquainted with the justice system, and [ ] knowledgeable about legal proceedings," even demonstrating a "moderate level of sophistication about the legal system." Lambert was deemed competent to stand trial, free of any serious mental illness or defect, and highly dangerous.

Lambert authored several key notes before, during, and after his trial. Prior to his trial, on October 14, 1997, Lambert wrote to John Knodell, the prosecuting attorney assigned to his case. In the note Lambert stated, "if I lose my trial I face life in prison without parole." He continued,"[T]o me I would rather prefer the death penalty [sic] and just get everything out of the way instead of sitting and rotting in a cell just waiting to die anyway."

On the first day of his criminal trial, immediately following opening statements, Lambert authored another note, this time addressed to his court-appointed attorney, Romero. The text of the note indicated a strong personal desire to plead guilty to, and take responsibility for, Mrs. Smithson's murder, but an ambiguous reference in the margin suggested that Lambert might have harbored some confusion as to the punishment which would attach to his plea.[3]

After receiving the note, Romero asked for and was granted a recess, lasting somewhere between five and twenty minutes. During this time, in the presence of a Grant County security officer, Lambert discussed his desire to change his plea with Romero. After talking with Lambert, Romero informed prosecutor Knodell of his client's decision. Knodell agreed to

---

1. Betancourt's sentencing was deferred until after Lambert's trial.

2. During this interview, Lambert also demonstrated confusion regarding his eligibility for the death penalty, at one point suggesting that

his age might engender the sympathy of the jury so as to prevent them from recommending the death penalty.

3. The precise content of the note is subject to a protective order issued by the district court.

dismiss the aggravated first-degree murder charge for the death of Homer Smithson, and amend the Information to charge Lambert with one count of aggravated first-degree murder for the death of Vada Smithson. The court then proceeded to a hearing in which Lambert pled guilty to the aggravated first-degree murder of Vada Smithson.

The trial judge thoroughly questioned Lambert as to whether he was freely and voluntarily pleading guilty, seeking to verify, as well, that he understood the punishment for his crime. Because adjudication of the constitutional claims that Lambert raised after the entry of his guilty plea calls for a highly contextual and fact-dependent analysis, we reproduce, in full, the heart of the plea colloquy:

The Court: Mr. Lambert; is your mind clear?

Lambert: Yes, Your Honor.

The Court: At this moment are you under the influence of alcohol, drugs or prescription medicine?

Lambert: No, Your Honor.

The Court: Mr. Lambert, do you understand that by an amendment to the Information against you, you are now charged with Aggravated Murder in the First Degree of Veda [sic] Smithson?

Lambert: Yes, Your Honor.

The Court: Mr. Lambert, the punishment imposed by law for that offense, whether a person is convicted after a trial or pleads guilty, is a mandatory term of life in prison without the possibility of parole.

Lambert: Yes, Your Honor.

The Court: Understand that?

Lambert: Yes, sir.

Lambert signed the Statement of Defendant on Plea of Guilty to a Felony, which included provisions plainly setting forth the elements of the crime to which he had pled and the sentence. Section 6(a) of the Statement provided, "The crime with which I am charged carries a maximum sentence, a fine, and a STANDARD SENTENCING RANGE as follows: Count No. 1 ... Life imprisonment without possibility of parole." The Statement concluded with the declaration, "My lawyer has explained to me, and we have fully discussed, all of the above paragraphs. I understand them all. I have been given a copy of 'Statement of Defendant on Plea of Guilty.' I have no further questions to ask of the judge." The court questioned Lambert to ascertain whether he understood the document:

The Court: Mr. Lambert, I have in hand here a document called Statement of Defendant on Plea of Guilty to a felony. Did you sign this document here today?

Lambert: Yes, Your Honor, and I dated it.

The Court: Before you signed it did you read the document carefully?

Lambert: Yes, Your Honor and discussed it with my lawyer.

The Court: Did you have a full opportunity to discuss the amended charge and your plea and the matters regarding the sentence with Mr. Romero?

Lambert: Yes, Your Honor.

The trial court emphasized that Lambert stood to gain no advantage by pleading guilty, stating that "the punishment imposed by law for [aggravated first-degree murder], whether a person is convicted after a trial or pleads guilty, is a mandatory term of life in prison without the possibility of parole." Lambert said that he understood. The court questioned Lambert at length to ensure that he comprehended the consequences of pleading guilty:

The Court: Do you understand, Mr. Lambert, that by pleading guilty you're giving up certain valuable constitutional rights?

Lambert: Yes, Your Honor. I went over that with my lawyer too.

The Court: Good, I'm glad you did, and we'll go over it here for the record and then when we finish that, if you need any more time to talk with your lawyer or have any questions for me, we'll have a chance for that too. Perhaps, most significantly, by pleading guilty you're giving up the right to have a trial, which we've already begun here. Now, do you understand that?

Lambert: Yes, sir.

The Court: In other words, to say it as simply as possible, if you plead guilty the trial will end and the next thing that will happen will be sentencing.

Lambert: Yes, sir.

The Court: All right. You also give up the right to appeal to a higher court after a trial. Do you understand that?

Lambert: Yes, sir.

The Court: If we completed the trial, Mr. Lambert, or continued with it, you would have the right to hear and to see anyone who gave evidence against you, you would have the right to require witnesses to appear and testify on your behalf, you would have the right to testify yourself or not as you saw fit, and you would be convicted of an offense only if the jury unanimously found that you were guilty based on the evidence beyond a reasonable doubt. Do you understand that?

Lambert: Yes, sir.

The Court: Mr. Lambert, before I call upon you to state your plea, do you want any more time to consult with your lawyer?

Lambert: No, sir.

The Court: Do you have any questions for me?

Lambert: No sir.

Next, the trial court inquired into Lambert's competency to plead guilty. The court questioned Lambert's attorney, Romero, and the prosecuting attorney, Knodell, about the findings of Dr. Mays, the mental health professional who had examined Lambert prior to trial. Satisfied that Lambert was competent, the court then heard the following testimony from Romero:

Mr. Romero: For the record, my client has indicated to me that he had been thinking about this decision for quite sometime [sic]. We had—I had met with him on a regular, on a daily basis for the last two weeks preparing him for trial, and also with an anticipation of a plea agreement that was initially rejected by the State also. So it's not something he decided spontaneously or made a compulsive decision, impulsive decision, excuse me. I gave him the Statement of Defendant on Plea of Guilty and he read it to me aloud, word by word, except for pages, the last two pages. Also present during the reading of the Statement of Defendant on Plea of Guilty was an employee for Grant County jail. After thoroughly reading the statement on the plea of guilty I asked my client specifically if he understood the charge and he responded affirmative. He agreed with the elements. Also I made it quite clear to him if he understood the rights that he was giving up and he responded affirmative that he understood every right. And that the sentence for this was life imprisonment without possibility of parole. He also agreed to the other parts of the statement on plea of guilty, Your Honor.

The trial court then methodologically recited each inapplicable provision of the

plea agreement to ensure that Lambert understood precisely what he was—and what he was not—agreeing to:

The Court: All Right. Thank you, Counsel. Mr. Lambert, if you'll stand please. One last detail here, Mr. Lambert. There are several paragraphs of this statement that I'm sure you discovered as you read through don't really apply to this case.

Lambert: Yes, Your Honor.

The Court: And the way the form is printed, they ask you and I both initial, crossing those out. Instead of doing that I'm simply going to do it aloud. There is a paragraph here called paragraph I that relates to being sentenced for two or more violent offenses, do you understand that does not apply?

Lambert: Yes, Your Honor.

The Court: There is a paragraph called paragraph J that applies to or relates to placement in the community after release from prison, and understand that because of the sentence that's mandatory in this matter, there will be no release to community placement?

Lambert: Yes, sir.

The Court: There is a paragraph K relating to first-time offenders and you realize that you are not eligible to be sentenced as a first-time offender?

Lambert: Yes, sir.

The Court: There is a paragraph called M that relates to sex offenses, prostitution and drug offenses with hypodermic needles; you recognize that does not apply?

Lambert's answers demonstrated that he had thoroughly read each provision of the plea agreement:

Lambert: Yes, sir. I think you forgot one, Your Honor, number L.

The Court: Well that one begins with or says "if I have a driver's license" and I recognize that you do not. I appreciate your pointing that out. Paragraph P also relates to sex offenses. You recognize that does not apply?

Lambert: Yes, sir.

Finally, the trial court questioned Lambert to determine whether he was voluntarily pleading guilty:

The Court: Mr. Lambert, has anyone put any pressure on you to enter a plea to this amended charge?

Lambert: No, sir.

The Court: Has anyone promised you any treatment other than the mandatory sentence I've outlined?

Lambert: No, sir.

The Court: Has anyone threatened you in any way?

Lambert: No, sir.

The Court: When I say anyone, I mean that literally; anyone inside the court system, in the jail, outside?

Lambert: No, sir.

The Court: Is the plea that you intend to enter to this charge a free and voluntary act and decision on your part?

Lambert: Yes, sir.

The Court: And do you base that decision on what you believe to be in your best legal interest?

Lambert: Yes, sir.

The Court: Mr. Lambert, do you have any questions for me?

Lambert: No, sir.

The Court: To the Amended Information in this case charging you with Aggravated Murder in the First Degree in the death of Veda [sic] Smithson, what is your plea?

Lambert: Guilty.

The Court: Noting that the defendant has adopted the probable cause state-

ment filed by the State as a factual basis for the plea, that plea is accepted.

That afternoon, Lambert received the sentence mandated by state law and set forth in his plea agreement: life imprisonment without the possibility of parole or other release. Significantly, the record contains another note, presumably written by Lambert on the day of his plea, entitled "Responsibility." In the note, Lambert stated:

> Today is the day I took responsibility for my actions, it is also the day I start my life in prison.... Maybe I will survive where I'm going, but we can never tell, the guards may come one day and find me dead in my cell, but at least I know in my heart and mind that I have taken responsibility for my crime.[4]

### B. State Court Post–Conviction Review and Procedural History

#### 1. Washington Court of Appeals

After serving approximately one year of his life sentence, Lambert procured new counsel and filed a Personal Restraint Petition with the Washington Court of Appeals, challenging his conviction on numerous grounds. He alleged that his plea was not knowing, voluntary and intelligent because he entered it without the advice of counsel and did not understand that it would result in life imprisonment without the possibility of parole. He alleged that he was denied the effective assistance of counsel because his attorney, Romero, was associated in the same public defender group as Earl, the attorney representing

Betancourt (Lambert's co-defendant). He also alleged that he was denied constitutionally adequate representation because his attorney misadvised him to stipulate to adult court jurisdiction and failed to advise him against entering a plea that resulted in the same sentence he would have received had he been convicted after a trial.

In an effort to permit Lambert to make a record in support of his claims, the Washington Court of Appeals ordered Lambert's prior attorney, Romero, to submit to a deposition by Lambert's current counsel. At the deposition, Romero was questioned at length regarding his relationship with Betancourt's attorney, Earl, and his representation of Lambert both prior to and in connection with his guilty plea. At several points during the deposition, Lambert's current attorney effectively dissuaded Romero from answering several questions regarding his representation of Lambert by asserting attorney-client privilege.[5]

After reviewing the evidence and deposition testimony, the Washington Court of Appeals issued an eleven-page Order Dismissing Lambert's Personal Restraint Petition, in which the court outlined its understanding of the facts and its reasons for dismissing each of Lambert's claims. *In re Lambert*, No. 18069–7–III (Wash.Ct. App., Nov. 17, 1999) (hereinafter "Order"). Beginning with the alleged ineffective assistance of counsel due to a conflict of interest, the court observed that "If Mr. Earl and Mr. Romero were associated in the same firm, then their representations

---

4. Sometime after his trial, following commencement of his incarceration, Lambert wrote a second note to Knodell, tauntingly praising him for having sent "a sixteen year old kid to prison for the rest of his life," and asking him to "fill out [his] pardon paper work."

5. While Lambert's current counsel repeatedly objected on the basis of attorney-client privilege throughout the deposition, Romero only claimed the privilege in response to questions regarding what Lambert told him about the crime, and the contents of the note that Lambert passed to him immediately before he pled guilty.

of Mr. Betancourt and Mr. Lambert were adverse and violated [Washington Rule of Professional Conduct] 1.7(b)." Order, *supra*, at 3. After reviewing the deposition testimony, however, the court concluded that Romero and Earl were not associated in the same firm; rather, they were each independent contractors of The Defenders, which held the public defense contract for Grant County. Order, *supra*, at 3–4. Romero and Earl each maintained separate law offices in the same building. Different clerical workers were assigned to each attorney. Romero kept his files separate, did not share a bank or trust account with Earl or with Earl's firm, and had his own business cards and letterhead. Therefore, the court concluded that"[t]he record does not support Mr. Lambert's allegations that Mr. Romero had a conflict of interest." Order, *supra*, at 4.

The court then proceeded to analyze Lambert's claim that Romero provided him ineffective assistance of counsel because he allegedly did not advise him, at the time he stipulated to the declination of juvenile court jurisdiction, that the sentence in superior court for an aggravated murder conviction was mandatory life imprisonment with no possibility of parole. In support of this claim, the court considered the declaration of Simmie Baer, an attorney specializing in juvenile law, that Romero's representation in this regard fell below the minimum standards of competency in the profession. The court also considered Romero's deposition testimony, wherein he stated that he did not recall the specifics of his conversations and advice to Lambert, but believed he probably told Lambert it was not to his advantage to stipulate to the declination. The court phrased the legal standard for judging this claim as follows:

> To prevail in a claim of ineffective assistance, a petitioner in a personal restraint petition must show by competent evidence that counsel's performance was deficient and that the deficient performance resulted in his actual and substantial prejudice. Here, Mr. Lambert must show that Mr. Romero's performance was deficient because he allegedly failed to advise him of the mandatory sentence in adult court, *and* that it was probable he could have opposed declination of juvenile court jurisdiction successfully, if he had chosen to do so.

Order, *supra*, at 5 (citation omitted) (emphasis in original). Citing the factors influencing a juvenile court's decision to decline jurisdiction as outlined in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the court concluded that Lambert had not satisfied the latter requirement. Order, *supra*, at 5–7. According to the court, the first factor—the seriousness of the offense—weighed against Lambert as aggravated first-degree murder is the most serious homicide. The second and third considerations—whether the juvenile committed the offense in an aggressive, violent, premeditated, or willful manner, and whether the offense was against persons or against property—similarly weighed against Lambert who, according to his own confession, willfully and violently shot Mrs. Smithson while she was on the telephone calling for help. Given Lambert's confession, which was crucial to the State's proof, the fourth consideration—the merit of the State's case against Lambert—likewise weighed against retaining juvenile court jurisdiction. The fifth consideration—the desirability of one trial in adult court in cases involving adult co-defendants—was inapplicable because the other perpetrator was also a juvenile. Both the sixth and seventh considerations—the sophistication and maturity of the juvenile and his prior criminal history—weighed against retaining juvenile jurisdiction. The court found

no evidence that Lambert, age 15 at the time of the murders, was immature or unsophisticated for his age, and his prior criminal record included a sex offense and a theft conviction. Finally, the court inquired into the eighth consideration— whether the juvenile system could adequately protect the safety of the community—concluding that it could not, since it only has authority to detain juveniles until their twenty-first birthday. Finding that "[v]irtually none of the *Kent* factors favored retention of juvenile court jurisdiction in Mr. Lambert's case," the court reasoned that under these circumstances it could not conclude that "a possibility, let alone a probability, of retention of juvenile court jurisdiction existed, even if Mr. Lambert had opposed declination." Order, *supra*, at 7. The court concluded that Lambert had failed to establish actual prejudice to his interests resulting from Romero's alleged failure to advise him. Accordingly, the court dismissed his claim of ineffective assistance premised on this ground. *Id.*

The court next assessed Lambert's claim of inadequate representation due to his alleged belief that he would get a shorter sentence if he pled guilty rather than proceeding with trial and potential conviction. Lambert again claimed that Romero did not advise him to the contrary. The court found this allegation contradicted by the record:

> His statement on plea of guilty recites that the punishment for aggravated first degree murder is mandatory life imprisonment. And, at the guilty plea hearing, the superior court was careful to insure that Mr. Lambert understood that the court had no discretion in this regard, and the punishment was the same whether he pleaded guilty or the jury convicted him. Regardless of Mr. Lambert's assertions about his counsel's failure to advise him, it is clear that a

reasonable person in Mr. Lambert's position would have known what his sentence was even before the court formally imposed it.

Order, *supra*, at 7–8 (citing *People v. Thew*, 201 Mich.App. 78, 506 N.W.2d 547, 550 (1993) (despite defendant's seventh-grade education and claim of psychiatric problems, trial court's advice that it had no discretion but to sentence him to life without parole was sufficient for court on appeal to reject his argument he did not understand that sentence was mandatory)). The court used the same evidence and analysis to reject Lambert's alternate assertion that his plea was not knowing and voluntary. Order, *supra*, at 8.

Finally, the court considered Lambert's claim of ineffective assistance premised on the fact that Romero accepted his decision to plead guilty after consulting with him for a very short time and in the presence of a jail employee. Lambert contended that he had questions he wanted to ask Romero during their brief conversation regarding his guilty plea, but he did not feel comfortable asking them within earshot of the jailer. The court considered Lambert's allegation that he was unaware if he proceeded to trial he might be convicted of a lesser offense, and that his conversation with Romero about his decision to plead guilty lasted between five and ten minutes and went as follows:

> When I told Mr. Romero I wanted to plead guilty, he said, "Whatever you want." He did not ask me why I wanted to plead guilty. He did not suggest that we go on with the trial for a day or two, while I thought very carefully about whether I really wanted to plead guilty. He did not try to talk me out of pleading guilty. He did not give me any advice one way or another on whether I should plead guilty.

Order, *supra*, at 8. To resolve this claim, the court again reviewed the deposition testimony in which Romero testified that he told Lambert he would not gain *any* advantage by pleading guilty. Romero consistently asserted that Lambert expressed a desire to plead guilty in order to feel better about himself and to resolve the entire situation.[6] The court noted Romero's testimony that he had no specific recollection as to whether he advised Lambert not to plead guilty, and his testimony that a reasonable probability existed that a jury would have acquitted Lambert of the first-degree aggravated murder of Mr. Smithson and convicted him only of the non-aggravated first-degree murder of Mrs. Smithson. The court also considered the declaration of Michael Iaria, an attorney specializing in criminal defense, who testified that Romero's performance fell below the objective standard of practice in the profession in several areas, including his meeting with Lambert in the presence of a jail employee.

Yet, the court found other evidence which contradicted this testimony. Notably, at the guilty plea hearing, Romero advised the court in Lambert's presence that Lambert had indicated to him that he had been thinking about pleading guilty "for a long time." Order, *supra*, at 10. Romero stated that he had instructed Lambert to read the statement on plea of guilty out loud, and that he had ensured that Lambert understood the charge. The court also noted that Lambert was questioned directly by the trial court on these issues.

Applying the law to the facts so found, the court articulated the following test for challenging a guilty plea on the basis of ineffective assistance:

(1) he must show counsel's performance was deficient; and (2) that the deficient performance prejudiced him. *In re Personal Restraint of Oseguera–Acevedo*, 137 Wash.2d 179, 198, 970 P.2d 299 (1999) (citing *Strickland v. Washington*, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)). In the context of a guilty plea, he must show "a reasonable probability [existed] that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." *Id.* at 198–99 [970 P.2d 299]. "A bare allegation that a petitioner would not have pleaded guilty if he had known all the consequences of the plea is not sufficient to establish prejudice under the ... test." *Riley*, 122 Wash.2d at 782 [863 P.2d 554]. Rather, "the petitioner must present [ ] at least a prima facie case showing actual prejudice." *Id.*

Order, *supra*, at 11. The court concluded that Lambert's bare allegation that he would not have pled guilty had Romero strongly opposed his decision was contradicted by the weight of the evidence and was insufficient to establish prejudice. In support of its conclusion, the court cited Lambert's Statement on Plea of Guilty and the record of the plea hearing, both of which tended to establish that Lambert understood the charge and sentence to which he was pleading. Moreover, despite Romero's unsupported assertion that a jury may have convicted Lambert of only one count of non-aggravated first-degree murder, the court found that Lambert's own confession—by itself—described facts that would support a conviction of two

---

6. We note that this testimony is also consistent with Lambert's note, written on the day of his plea, entitled "Responsibility," which outlines his desire to take responsibility for his actions, to start his life in prison, and to know in his heart and mind that he has taken responsibility for his crime. Additionally, Romero's testimony comports with the note Lambert wrote immediately following opening statements in his trial.

counts of aggravated first degree murder. After distinguishing other cases addressing effectiveness of counsel representing minors in guilty pleas, the court concluded that Lambert had failed to establish the prejudice prong of his argument and was not entitled to relief on the basis of ineffectiveness. Accordingly, the court denied Lambert's personal restraint petition. Order, *supra*, at 12.

### 2. Washington Supreme Court

On appeal to the Washington Supreme Court, Lambert again challenged his plea and conviction. To resolve his claims, the Washington Supreme Court undertook an independent review of the record. In an eight-page written Ruling Denying Review by the Commissioner, it concluded that Lambert had failed to state facts that would entitle him to post-conviction relief. *In re Personal Restraint Pet. of Lambert*, No. 68929–6 (Wash., Feb. 7, 2000) (hereinafter "Ruling").

Initially, the court noted that the attorney-client privilege was improperly asserted during Romero's deposition because "by accusing Mr. Romero of representing him ineffectively, Mr. Lambert waived the attorney-client privilege to the extent necessary to enable counsel to respond to his allegations." Ruling, *supra*, at 3 (citing *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (inquiring into counsel's conversations with the defendant "may be critical to proper assessment of ineffective assistance claim"); *State v. Chervenell*, 99 Wash.2d 309, 662 P.2d 836, 840 (1983)). Nonetheless, the court concluded that Romero's testimony, together with the documents he provided and the affidavits submitted by the State, was adequate to dispose of Lambert's conflict of interest claim. The court noted that in order to prevail on this claim,

Lambert "must show that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Ruling, *supra*, at 4 (citing *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Reviewing the evidence, the court found that "[t]he potential for such conflicts . . . does not necessarily exist when, as in this case, codefendants are represented by different attorneys, albeit in the same public defender office." Ruling, *supra*, at 4 (quoting *United States v. Trevino*, 992 F.2d 64, 66 (5th Cir.1993)). The court found no evidence indicating that Romero and Earl shared any confidential communications either directly or by viewing the other's files. Ruling, *supra*, at 5 (citing *United States v. Turchi*, 645 F.Supp. 558, 563 (E.D.Pa.1986)). Although Romero's contract allowed him to rent office space from Earl and Earl, Inc., it did not permit him access to any files owned by Earl and Earl, Inc., and his contact with other public defenders was minimal. Finding that Romero and Earl did not even discuss the Smithson murder case, the court rejected Lambert's claim of ineffective assistance due to a conflict of interest. Ruling, *supra*, at 5.

The court used a similar analysis to dispose of Lambert's claim that Romero failed to investigate Betancourt's criminal history because of his relationship with Earl. *Id.* The court found this allegation speculative, unsupported, and largely immaterial. Reasoning, primarily, that Betancourt was merely one of three witnesses expected to provide extremely damaging testimony against Lambert at trial,[7] the court ultimately concluded that

---

7. The most damaging testimony was expected to come from Hinkle, who, had she testified

consistently with her statement to police,

Lambert had not shown that Romero's error was caused by, or even related to, Earl's representation of *Betancourt*. *Id.*

Next, the court addressed Lambert's claim of ineffective assistance premised on Romero's decision to stipulate to the declination of juvenile court jurisdiction. Ruling, *supra*, at 6. Citing *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052, the court noted that Lambert must show that he was prejudiced by Romero's error. Ruling, *supra*, at 6. Responding to Lambert's argument that a declination order is per se prejudicial, the court stated, "That may well be true if the declination order is itself erroneous. But there is nothing erroneous about this declination order unless Mr. Lambert was deprived of his right to effective assistance in connection with its entry. And he was not deprived of that right unless there is a reasonable probability that counsel's error affected the outcome of the declination proceeding." Ruling, *supra*, at 6 (citing *State v. Jack*, 144 N.J. 240, 676 A.2d 545, 551 (1996)). Again, citing the factors set forth in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the court concluded that, because the evidence favored declination,[8] the result in Lambert's case would have been the same despite Romero's stipulation, Romero's alleged error did not affect the outcome, and it was, therefore, not prejudicial. Ruling, *supra*, at 7.

Finally, the court addressed Lambert's arguments challenging the validity of his guilty plea. Ruling, *supra*, at 7–8. Reviewing the evidence in the record, the court found that, under the circumstances, a reasonably competent attorney could conclude that Lambert stood to gain some

personal advantage by entering the guilty plea that he had proposed; namely, Lambert avoided being labeled a double murderer and sitting through a trial in which the State's case against him was extremely strong. Based on the evidence in the record, both of these results were apparently of some importance to Lambert at the time. Ruling, *supra*, at 7.

Additionally, the court found Lambert's claim that he thought he was shortening his sentence by pleading guilty unsupported by the evidence in the record. In particular, the court noted that the psychological report on Lambert demonstrates that he understood the seriousness of his crime and the punishment which could attach. Ruling, *supra*, at 8. The court also relied on Lambert's statements to the court before entering his plea that he understood a conviction on one count carried a mandatory sentence of "life in prison without the possibility of parole." *Id.* Lambert did not explain by affidavit or otherwise the alternative meaning he ascribed to these words, and the court found the term of confinement neither confusing nor unclear. On the basis of all of the evidence in the record before the court, it concluded that Lambert had not shown that the court of appeals erred in dismissing his personal restraint petition or that review was otherwise called for. *Id.* Accordingly, the court denied Lambert's motion for discretionary review. Soon thereafter, Lambert filed a motion to modify the ruling. The supreme court denied that motion on May 2, 2000.

### C. *Federal Court Habeas Review and Procedural History*

After exhausting his constitutional claims in state court, Lambert filed an

---

would have described a planned, cold-blooded double murder.

**8.** In concluding that Romero's error was not prejudicial, the court noted that the juvenile

court declined jurisdiction over Melanie Hinkle, even though she was not present during the murders and had no prior criminal history.

initial habeas petition, on May 3, 2000, in the United States District Court for the Western District of Washington. The matter was transferred to the Eastern District of Washington, and an amended petition was filed on May 19, 2000.[9]

Lambert's habeas petition renewed his two main allegations—that he received ineffective assistance of counsel and that his guilty plea was not knowing, voluntary, and intelligent. Specifically, Lambert alleged that Romero provided ineffective assistance of counsel (a) when he stipulated to the juvenile court's declination of jurisdiction and transfer of Lambert's case to adult court, (b) in conjunction with Lambert's guilty plea and the investigation preceding it, and (c) because Romero labored under an actual conflict of interest created by his relationship with the attorney representing Lambert's co-defendant. *See Lambert v. Blodgett*, 248 F.Supp.2d 988, 993 (E.D.Wash.2003).

The district court granted Lambert's request to conduct discovery. Concluding that the Washington state courts had

failed to conduct a "full and fair hearing to reasonably find the relevant facts and resolve inconsistencies," the district court also granted Lambert's request for an evidentiary hearing. *Id.* at 994. In the evidentiary hearing, which commenced June 11, 2002 and concluded the following day, the district court heard testimony from nine witnesses for Lambert and one witness for the state.[10] *Id.* After the hearing, the district court allowed the parties to file post-hearing briefing and proposed findings of fact and conclusions of law. In its post-hearing brief, the State challenged an allegation that Lambert raised for the first time in federal court: that he was provided ineffective assistance of counsel because Romero did not learn that the tape-recorded confession he provided to police had been "enhanced," or re-recorded at a higher volume, by police. Detective Matney of the Grant County Sheriff's Department had filed a report explaining his actions on May 24, 1997, and this evidence was provided to Lambert's counsel during discovery prior to the Washington Court of Appeals' ruling on his Personal Re-

---

**9.** The State and Lambert stipulated to a stay of the district court proceedings while the Washington State Bar Association ("WSBA") conducted disciplinary proceedings against Lambert's former attorney, Romero. The Supreme Court of Washington ordered Romero's disbarment on July 22, 2004, for misconduct spanning six years and involving seven different client matters, including an unlawful fee arrangement made in connection with Lambert's aggravated murder trial. *See In the Matter of the Disciplinary Proceeding Against Romero*, 152 Wash.2d 124, 94 P.3d 939, 940–41 (2004). Lambert's mother testified that Romero asked for $10,000 to hire an investigator and a mental health expert. This violated Washington Rules of Professional Conduct 1.4(b), 7.1, and 8.4(b), which prohibit requests for costs on behalf of a court-appointed client. The WSBA recommended a 90–day suspension for this infraction, but recommended disbarment in an unrelated matter. Noting the cumulative effect of all of the

misconduct alleged, the Washington Supreme Court concluded that disbarment was the appropriate sanction.

**10.** Lambert moved to have portions of the evidence and courtroom discussion sealed, citing the protection of his Fifth Amendment privilege against self-incrimination. At the evidentiary hearing, Lambert's note, in which he said he wanted to plead guilty to killing Vada Smithson, as well as other items of Lambert's correspondence with his attorney, the prosecutor, and personal writings, were admitted under seal. The district court issued a protective order limiting the disclosure of privileged information communicated between Lambert and Romero. Additionally, the district court cleared the courtroom during Lambert's testimony, sealed portions of the hearing transcript involving privileged communication, and made those portions subject to the protective order.

straint Petition. *Id.*[11] The district court rejected the State's contention that Lambert failed to exhaust the "enhanced tape recording" basis for his ineffective assistance of counsel claim. *Id.* Finding "no evidence that Mr. Lambert knew of the enhanced tape issue prior to filing his federal habeas petition and deliberately withheld it from the state courts," the court concluded that the issue did not fundamentally alter the ineffective assistance of counsel claim presented to the state courts. *Id.* at 995 (citing *Vasquez v. Hillery,* 474 U.S. 254, 257–60, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)). On the basis of this evidence, the district court subsequently granted Lambert's request to depose former Grant County Sheriff Detective Ronald Thompson. *Lambert,* 248 F.Supp.2d at 995.

The district court next inquired into the applicable standard of review. *Id.* at 997. After noting that the case is governed by AEDPA, the court outlined its understanding of the deferential review mandated by the statute. *Id.* According to the district court, a habeas petition is appropriately granted if the state court's "factual findings were clearly erroneous," which requires a finding, "in effect, that the state court was wrong and the petitioner is cor-

rect." *Id.* (citing *Avila v. Galaza,* 297 F.3d 911, 918 (9th Cir.2002)). The court also noted that under AEDPA, state court factual findings are entitled to a presumption of correctness, but concluded that the Washington courts' findings did not deserve such deference because "adjudication on the merits in state court [was] not possible" after "the state court deni[ed] Lambert] an evidentiary hearing to develop facts on [his] claim[s]." *Id.* at 998 (citing *Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir.2002)). The court also declined to defer to the Washington courts' findings concerning Romero's alleged ineffective assistance because certain evidence supporting that claim—namely, the enhanced tape recording of Lambert's statement to the police and the transcription error—was produced only at the federal evidentiary hearing. *See Lambert,* 248 F.Supp.2d at 998 ("Deference should not be accorded to state court findings of fact related to this issue." (citing *Killian,* 282 F.3d at 1208)).[12] Concluding its analysis of the standard of review, the district court gave one-sentence mention to the prospect that even if the state court's factual findings are deserving of deference, "Lambert has rebutted the factual determinations with clear and convincing evidence." *Id.*

---

11. Lambert revealed that the tape recording made of his interview with the Grant County detectives on the day of his arrest had been re-recorded by Matney on his home stereo system at a higher volume in order to make the voices audible. Lambert alleged that the transcript of his recorded confession inaccurately quoted him as saying that he planned to "shoot" Vada Smithson. He claims that his actual statement to police was that he and the boys planned to "jack" or "rob" the Smithsons. This allegedly false admission was quoted by the prosecutor in his opening statement just before Lambert decided to plead guilty.

12. The district court noted that the Washington Court of Appeals did allow Lambert to

depose Romero but, referencing the Washington Supreme Court's observation in its Ruling Denying Review that Lambert's counsel dissuaded Romero from answering several questions by asserting attorney-client privilege, the court expressed doubt as to the effectiveness of the deposition for fact development on the ineffective assistance of counsel claim. *Id.* The district court concluded that because the Washington Supreme Court ruled on evidence known to be incomplete, it effectively denied Lambert the last opportunity within the state courts to fully develop the factual basis for his ineffective assistance of counsel claim. According to the district court, this rendered the factual findings unworthy of deference. *Id.*

Relieved of the state court's findings, the district court then proceeded to adjudicate the merits of Lambert's claims anew. *Id.* at 998–1008. First, concluding that the state courts erroneously considered the claim, the district court dismissed, with prejudice, Lambert's claim of ineffective assistance premised on Romero's stipulation to transfer his case from juvenile court. *Id.* at 999–1000. According to the district court, this ground could not be considered as an independent constitutional violation because it occurred prior to the entry of Lambert's guilty plea. *Id.* at 999 (citing *Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); *Ortberg v. Moody,* 961 F.2d 135, 137–38 (9th Cir.1992); *Rodriguez v. Ricketts,* 798 F.2d 1250, 1252 (9th Cir.1986) ("a guilty plea in adult court waives defects in a juvenile fitness hearing")).

The court next considered Lambert's claim that Romero provided ineffective assistance in conjunction with his guilty plea and the investigation preceding it. *Id.* at 1000. Remarking that the "state court did not comment on Mr. Romero's duty to investigate imposed by *Strickland,*" the court initially concluded that "there are no findings by the state court to which deference must be given." *Id.* The court then considered the expert testimony of Michael Iaria—the very same expert witness heard by the state court—that Romero's conduct fell below the objective standard of reasonableness. The district court concluded that, because of Lambert's age and "possible medical problems," Romero's conduct was objectively unreasonable. *Id.* at 1001.[13]

The court next characterized the state court's finding that "a reasonably compe-

tent attorney could conclude that Mr. Lambert had nothing to lose by pleading guilty" as an unreasonable application of the law of *Strickland* and *Hill. Id.* The court concluded that Romero's failure to investigate prior to Lambert's plea and his failure to dissuade Lambert from pleading guilty were objectively unreasonable, and held that the Washington court's contrary finding was "clearly erroneous." *Id.* at 1001.

Revisiting the second prong of *Strickland* (i.e., that the deficient performance prejudiced the defense), the district court again ruled that two state court factual findings—(1) the finding that Lambert understood the meaning of his sentence, and (2) the rejection, based upon the record, of Lambert's contention that he thought he was shortening his sentence by pleading guilty—were "clearly erroneous" and rebutted by clear and convincing evidence. *Id.* at 1002. After accepting other evidence and testimony offered by Lambert, the court concluded that "prejudice resulted from Mr. Romero's failure to offer advice on the plea that adequately informed Mr. Lambert of the consequences." *Id.* at 1004. The court also accepted Lambert's testimony that "had he known of the enhanced tape recording and the transcription error he would have proceeded differently," concluding that "prejudice resulted from Mr. Romero's failure to investigate" as well. *Id.*

Moving on to Lambert's conflict of interest claim, the court again disagreed with the state court's factual findings and, using an ethical imputed disqualification analysis, expressed concern about Romero's ability to effectively represent Lambert. *Id.* at 1006–07. However, noting that the

---

**13.** The court did not elaborate on the basis for its finding that Lambert had "possible medical problems," despite the fact that the state court explicitly recognized and accepted the findings of psychologists who examined Lambert and concluded that he was competent and did not suffer from any serious mental disorder.

United States "Supreme Court has never applied the ethical imputed disqualification rule in Sixth Amendment analysis, but has only 'assum[ed] without deciding that two law partners are considered as one attorney,'" the court concluded that Lambert had not established ineffective assistance of counsel based upon 17346 this ground. *Id.* at 1007 (quoting *Burger,* 483 U.S. at 783, 107 S.Ct. 3114). Accordingly, the court dismissed Lambert's conflict of interest claim with prejudice.

Finally, the district court reached Lambert's allegation that his guilty plea was not knowing, voluntary and intelligent. *Id.* The court declared that the state court's determination that Lambert understood the meaning of his sentence was an unreasonable determination of the facts in light of the evidence. Reasoning that the finding was clearly erroneous and rebutted by clear and convincing evidence, the district court concluded that Lambert's plea was not knowing and voluntary and his due process rights were, therefore, violated. *Id.* at 1008–09. On January 17, 2003, the district court granted Lambert's habeas petition and ordered the State to release Lambert from custody or to vacate his guilty plea and conduct a new trial in ninety days.

The state of Washington subsequently timely appealed to this court, alleging numerous grounds for error. The State alleges that the district court erred by (1) not deferring to the state court's factual findings and by applying a "clearly erroneous" standard of review; (2) finding that Lambert had exhausted his federal claims in state court; (3) granting Lambert habeas relief on the basis that his guilty plea was not knowing, voluntary and intelligent; (4) granting Lambert habeas relief on the basis that he was denied the effective assistance of counsel during his plea and trial; (5) admitting the testimony of two experts in support of Lambert's claim that he was denied the effective assistance of counsel; (6) abusing its discretion by issuing a protective order sealing one exhibit and portions of the testimony at the evidentiary hearing; and (7) abusing its discretion by limiting who could represent Lambert at re-trial.

Lambert cross-appeals on the issues that the district court did not decide in his favor; namely, that his counsel had a conflict of interest because of an imputed disqualification and that his counsel was ineffective in stipulating to the transfer of juvenile jurisdiction.

## II. STANDARDS AND SCOPE OF REVIEW

The outcome of a petition for a writ of habeas corpus is frequently dictated by the applicable standard of review. In reviewing state proceedings under AEDPA, we are not called upon to decide the matter anew, nor are we permitted to review the state's judgment under the same standards as we would a judgment on direct appeal from a district court. Before proceeding to analyze the various claims brought here on appeal by the state of Washington and on cross-appeal by Lambert, we must first determine the standard that we should employ when reviewing the district court's decision to grant Lambert's habeas petition and, second, the standard that a federal district court should employ when reviewing a habeas corpus petition.

As to the first standard, we review *de novo* the district court's decision to grant or deny a petition for a writ of habeas corpus. *See DePetris v. Kuykendall,* 239 F.3d 1057, 1061 (9th Cir.2001). Factual findings and credibility determinations made by the district court in the context of granting or denying the petition are reviewed for clear error. *See Solis v. Garcia,* 219 F.3d 922, 926 (9th Cir.2000).

However, the district court's application of AEDPA, as well as its conclusion that the standards set forth in AEDPA are satisfied, is a mixed question of law and fact which we review *de novo*. *See Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (characterizing mixed questions of law and fact as those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard"). We may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale. *Paradis v. Arave*, 240 F.3d 1169, 1175–76 (9th Cir.2001).

■ The second standard—the standard that a federal district court should employ when reviewing a petition for a writ of habeas corpus in the first instance—requires a more complex analysis. As noted by the district court, because Lambert's application for habeas relief was filed after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), the extent of review is governed by AEDPA. *Woodford v. Garceau*, 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003); *Gill v. Ayers*, 342 F.3d 911, 917 (9th Cir.2003). While federal habeas corpus has always been an extraordinary remedy, not an alternative to the state's own appellate system, *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), AEDPA imports a new scheme of federal review of constitutional claims that have been "adjudicated on the merits" by the state court. 28 U.S.C. § 2254(d) (2003). Where it applies, AEDPA embodies the respect due a state court decision on collateral review in our federal system. *See Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Inspired by principles of comity, finality and federalism, AEDPA establishes a highly deferential standard for reviewing state court determinations. *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir.2004) (per curiam). Although AEDPA's scheme is complex, and its provisions have been subjected to multiple, sometimes conflicting, interpretations, this much is clear: deference to state court determinations must follow an adjudication on the merits.

## A. *Adjudication on the Merits*

Analysis and application of AEDPA's standard of review is separate from the question of whether a state "adjudicated" a prisoner's federal claims "on the merits." However, the precise meaning of "adjudicated on the merits" is itself a difficult question that has divided the courts of appeals. *See Washington v. Schriver*, 255 F.3d 45, 53 (2d Cir.2001) (noting the division). As of yet, neither Congress nor the Supreme Court has provided a clear definition.

For shorthand description, our cases employ the term "evidentiary hearing" to signify a form of adjudication that is sufficient to trigger AEDPA deference. *See Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir.2004); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir.2003); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002). In the present case, the district court concluded that no deference was due the Washington state court's factual findings because it had refused to grant Lambert a full post-conviction evidentiary hearing. *Lambert*, 248 F.Supp.2d at 998. The term "evidentiary hearing" appears nowhere in AEDPA. Yet, respondents invite us to elevate it to the status of an indispensable prerequisite to the deferential scheme.

■■ We decline to hold that AEDPA's reference to "adjudicated on the mer-

its" authorizes us to review the form or sufficiency of the proceedings conducted by the state court. Thus, we will not read into "adjudicated on the merits" a requirement that the state have conducted an evidentiary hearing, or indeed, any particular kind of hearing. Rather, we give the phrase its ordinary meaning: in general, "an 'adjudication upon the merits' is the opposite of a 'dismissal without prejudice.'" *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) (quoting FED. R. CIV. P. 41(a)).

AEDPA states that an application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless deferential review warrants issuance of the writ. 28 U.S.C. § 2254(d). The same section also refers to situations in which "the adjudication of the claim ... resulted in a decision," *id.* at §§ 2254(d)(1), (d)(2), giving rise to the argument that the phrase "adjudicated on the merits" necessarily contemplates some sort of judicial process beyond simply rendering "a decision." *See* Scott Dodson, *Habeas Review of Perfunctory State Court Decisions on the Merits*, 29 AM. J. CRIM. L. 223, 230–31 (2002); *see also Schriver*, 255 F.3d at 64 (Calabresi, J., concurring) (finding ambiguous AEDPA's use of the term "adjudicated on the merits" but preferring an interpretation which requires state courts to articulate their reasoning in order to trigger AEDPA deference). This interpretation ignores both the plain meaning of the terms and the context in which they appear. The word "adjudicated" means "to settle finally (the rights and duties of the parties to a court case) on the merits of the claim raised." Webster's Third New Int'l Dictionary 27 (2002). When the term "adjudicated" is juxtaposed with the phrase "on the merits" and isolated in a dependant clause, the phraseology chosen by Congress naturally highlights the force—and perhaps the redundancy—of the qualifier "on the merits" as a definitional term designating the type of adjudication envisioned. Simply put, the judicial process contemplated by AEDPA's use of the term "adjudicated" is plainly restricted by the force of the words "on the merits."

■ Elsewhere, the statute provides that "[a]n application for a writ of habeas corpus may be *denied on the merits*, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2) (emphasis added). As exhaustion is typically considered a procedural bar to relief, use of the phrase "on the merits" in this section signifies an exception to the general rule, and use of the word "denied" directly limits this exception to a particular category of adjudications. Read *in pari materia* with § 2254(d), we are persuaded that, in this context, the term "adjudicated" refers to whether the petition for post-conviction relief was either granted or denied, whereas the phrase "on the merits" requires that the grant or denial rest on substantive, rather than procedural, grounds.

■ Reinforcing our textual analysis is the usual presumption that when Congress employs a commonly used phrase like "adjudicated on the merits," it intends that term to retain its ordinary meaning. *See Miles v. Apex Marine*, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); RANDY-HERTZ & JAMES S. LIEBMAN, 1 FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 1422 & n. 4 (4th ed. 2001) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.") (quoting Felix Frankfurter, *Some Reflections*

*on the Reading of Statutes,* 47 Colum. L. Rev. 527, 537 (1947)). In the context of federal habeas review, the "adequate and independent state grounds" doctrine customarily distinguishes between adjudications "on the merits" and dismissals on procedural grounds, the latter of which are generally not subject to federal habeas review. *See, e.g., Harris v. Reed,* 489 U.S. 255, 260, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (federal courts generally may not review habeas claims decided by a state court on state grounds that are "independent of the merits of the federal claim and an adequate basis for the court's decision") (citations and internal quotations omitted). Moreover, AEDPA's phrase "adjudicated on the merits" is used in a manner similar to the phrase "adjudication on the merits" employed in Federal Rule of Civil Procedure 41. Under Rule 41(a)(1) "a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim." Rule 42(b) further provides that "[u]nless the court in its order for dismissal otherwise specifies, a dismissal [for failure to prosecute or comply with the Federal Rules of Civil Procedure or a court order] and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits." *See also* Sup. Ct. R. 20.4(b) ("Neither the denial of the petition, without more, nor an order of transfer to a district court under the authority of 28 U.S.C. § 2241(b), is an adjudication on the merits, and therefore does not preclude further application to another court for the relief sought."). The Court has recognized that, once directed by a court to pursue his state remedies, a habeas petitioner's unexhausted claims may be dismissed under Rule 41(b) for failure to comply with the court's order; on the merits, the dismissal is with prejudice and "operates as an adjudication on the merits." *Slack v. McDaniel,* 529 U.S. 473, 489, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see also Semtek Int'l, Inc.,* 531 U.S. at 500, 121 S.Ct. 1021; *Costello v. United States,* 365 U.S. 265, 285–87, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

Our prior cases likewise establish that the adjudication necessary to trigger AEDPA review is not restricted to any particular form of hearing. Instead, where we have inquired into whether a state court conducted an adjudication on the merits we have generally looked at whether the state court reached the merits of the petitioner's claim without dismissing it on procedural grounds. In *Brodit v. Cambra,* 350 F.3d 985 (9th Cir.2003), we applied AEDPA deference to the thorough explanation of the state court's reasoning as published in a reported decision, even though the state conducted no post-conviction hearing. *See id.* at 987, 993 & n. 2; *see also id.* at 1000–01 (Berzon, J., dissenting) (noting that the majority applied full AEDPA deference to a claim of ineffective assistance of counsel despite the absence of a state evidentiary hearing). In *Clark v. Murphy,* 331 F.3d 1062, 1066, 1072 (9th Cir.2003), we found the state court's review of the evidence presented at trial sufficient adjudication to trigger AEDPA deference. In *McClure v. Thompson,* 323 F.3d 1233, 1239, 1241 (9th Cir.2003), we applied AEDPA deferential review to a two-page denial letter to counsel wherein the state court merely asserted that it had accepted the credibility of the government's witnesses. *See id.* at 1241 ("Even though the state court's findings were relatively brief, we review those findings under AEDPA's usual standard."). In *Downs v. Hoyt,* 232 F.3d 1031, 1035 (9th Cir.2000), we deferred to findings set forth

in a short letter opinion coupled with a list of findings of fact. In *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir.2002), we concluded that "no adjudication on the merits in state court was possible" where the claim's factual predicate was concealed until the federal evidentiary hearing. In such a case, AEDPA cannot be triggered because the Act refers to any "claim" adjudicated on the merits, setting up a separate, claim-by-claim analysis as a condition to AEDPA review. If the claim was not, and could not have been, raised in the state court proceedings, we reasoned, it cannot possibly have been adjudicated in state court. On the other hand, in *Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir.2004), we rejected—without discussion—the argument that no adjudication on the merits had taken place where the state court ruled on the substance of each of the petitioner's constitutional claims after considering his own testimony and affidavits. Under these circumstances, we found abundant evidence to indicate that the state court "adjudicated" each of the petitioner's claims "on the merits." [14] In sum, our opinions indicate that the decisive factor necessary to trigger AEDPA deference is not an "evidentiary hearing"; rather, it is whether the state court adjudicated the defendant's claims. In each case we ask, did the state court decide the claim on the merits?

Although the jurisprudence interpreting the meaning of "adjudicated on the merits" lacks a certain precision and consistency, our interpretation is in accord with the reading adopted by the majority of the other circuit courts of appeals. *See, e.g., Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir.2003) ("To adjudicate a claim on the merits, the state court need not mention the argument raised or cite relevant case law, or even explain[ ] its reasoning process. Rather, a state court adjudicates a claim on its merits by (1) dispos[ing] of the claim on the merits, and (2) reduc[ing] its disposition to judgment.") (internal citations and quotation marks omitted); *Neal v. Puckett*, 239 F.3d 683, 686, 696 (5th Cir.2001) (defining adjudication on the merits as referring "to whether a court's disposition of the case was substantive as opposed to procedural"); *Valdez v. Cockrell*, 274 F.3d 941, 952 (5th Cir.2001) (declining to inject a "full and fair hearing" as a prerequisite to AEDPA deference); *Bell v. Jarvis*, 236 F.3d 149, 158–59 (4th Cir. 2000) (en banc) (finding an adjudication on the merits even where the state court did not articulate the rationale underlying its rejection of the defendant's constitutional claim); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir.1999) (holding that an "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim, and that a federal court must apply AEDPA deference to the result of a state court decision, even if the reasoning is not expressly stated). *But see Bryan v. Mullin*, 335 F.3d 1207, 1215–16 (10th Cir.2003) (en banc) (holding that pre-AEDPA standards apply to ineffective-assistance-of-counsel claims unless the state court holds an evidentiary hearing).

**14.** Our decision in *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir.2003), is not to the contrary. In *Nunes*, the state court rejected the petitioner's claims of ineffective assistance of counsel as failing to establish a prima facie case and then faulted him for failing to prove his claims. We concluded that the state court had put Nunes in a double bind, that Nunes had clearly stated a sufficient claim and that, "[w]ith the state court having purported to evaluate Nunes' claim for sufficiency alone, it should not have required Nunes to prove his claim without affording him an evidentiary hearing." *Id.* at 1054. Even as we concluded that, under the circumstances, the state court should have granted Nunes an evidentiary hearing, we treated the state court's decision as one adjudicated on the merits and subject to AEDPA's deferential review.

■ In sum, the text and structure of AEDPA, as well as our prior cases interpreting the statute, suggest that the phrase "adjudicated on the merits" was not used as a term of art unique to this context, but was understood to mean precisely what it does in nearly all modern legal contexts: "a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir.2001). In light of the foregoing, we conclude that the force of the phrase "adjudicated on the merits" lies in the words "on the merits." We decline to accept Lambert's proposal to inject an "evidentiary hearing" requirement as a pre-requisite to AEDPA deference. Instead, we hold that a state has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits.[15]

■ The record more than demonstrates that the Washington courts adjudicated Lambert's constitutional claims on the merits. In considering Lambert's personal restraint petition, the Washington Court of Appeals ordered Mr. Romero to submit to a deposition by Lambert's current counsel.[16] The court considered Lam-

---

**15.** Arguments for the expansive interpretation of "adjudicated on the merits" arise primarily in the context of cases in which the state court has denied the petitioner's constitutional claims without explanation. *Compare Washington v. Schriver*, 240 F.3d 101 (2d Cir. 2001) (holding that a state court decision on the merits unaccompanied by a federal rationale is not an "adjudication" entitled to AEDPA deference), *superceded by Washington v. Schriver*, 255 F.3d 45 (2d Cir.2001), *and Bell*, 236 F.3d at 184 (Motz, J., dissenting) ("State courts should not be allowed to insulate their decisions by failing to express their reasoning."), *with Santellan v. Cockrell*, 271 F.3d 190, 193–94 (5th Cir.2001) ("[I]f a state court denies a prisoner's claim without reasoning of any sort, our authority under AEDPA is still limited to determining the reasonableness of the ultimate decision."), *and Sellan*, 261 F.3d at 311 (holding that perfunctory decisions on the merits are "adjudications" under AEDPA). Because we are not presented with an unexplained state court adjudication, we express no opinion as to the deference that should be accorded a silent or perfunctory state court judgment. *Cf. Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. Only by that examination may we determine whether the state

court's decision was objectively reasonable." (citation omitted)).

**16.** Concluding that it was free to disregard the state courts' factual findings, the district court faulted the Washington courts for an allegedly less than effective deposition of Romero. *Lambert*, 248 F.Supp.2d at 998. The record shows that the actions of Lambert—not the state courts—caused the alleged deficiency in the deposition, as Lambert's new counsel repeatedly lodged objections to the prosecutor's questions regarding communications between Lambert and Romero on the basis of attorney-client privilege. In state collateral litigation, as well as federal habeas proceedings, it is the petitioner who bears the burden of proving his case. *See McKenzie v. McCormick*, 27 F.3d 1415, 1419 (9th Cir. 1994). The district court erred by assuming it was the duty of the state courts to ensure that Lambert developed the record. There is no authority for the district court to require state court findings over the objections of the petitioning party. Moreover, the only questions that Romero refused to answer on the basis of attorney-client privilege relate to the contents of the note passed to Romero on the day Lambert pled guilty and the facts of the alleged crime. The facts of the crime were irrelevant to Lambert's claims on post-conviction review. Thus, the only probative evidence not before the state courts as a result of the privilege is the note. As we outline be-

bert's own testimony and documents he provided. In addition, it considered the expert testimony of Michael Iaria, a criminal defense attorney, and Simmie Baer, an attorney who specializes in juvenile law. Moreover, over the State's objection, the court allowed Lambert to amend his personal restraint petition to raise, for the first time, two additional issues—Mr. Romero's alleged conflict of interest and ineffective assistance in advising Lambert regarding declination of juvenile court jurisdiction—and the court weighed each of these claims against the evidence. After conducting an extensive review of the record and considering the evidence supporting each of his constitutional claims, the court concluded that the record did not support Lambert's allegations. Accordingly, in an eleven-page written opinion addressing the merits of Lambert's claims of ineffective assistance and involuntariness, the court dismissed Lambert's personal restraint petition.

On appeal, the Washington Supreme Court reviewed the record anew. In its Ruling Denying Review, the court weighed each of Lambert's constitutional claims against both the evidence in the trial court record and the additional evidence submitted to the Washington Court of Appeals. In an eight-page written opinion, the court reasoned that Romero's testimony, togeth-er with the weight of the other evidence, was adequate to dispose of Lambert's claims.[17]

■■■ We find that the Washington courts adjudicated Lambert's constitutional claims on the merits. The Washington Court of Appeals had before it a "sufficiently complete[record] to allow [it] to decide the issue," *United States v. Hanoum,* 33 F.3d 1128, 1131 (9th Cir.1994), and it fully considered each of Lambert's claims in light of the record. Thus, the district court erred when it concluded that the Washington state courts had not adjudicated Lambert's constitutional claims on the merits because both state appellate courts denied Lambert an evidentiary hearing. *See Lambert,* 248 F.Supp.2d at 998. In light of our holding that § 2254 does not require a post-conviction hearing, only that claims have been adjudicated on the merits, we decline to decide whether the receipt of additional testimony constituted an evidentiary hearing. Although an evidentiary hearing might be evidence of an adjudication on the merits, it is a sufficient, rather than a necessary, condition to AEDPA deference. *See Sophanthavong,* 378 F.3d at 865–66 (concluding that a state court's consideration of "deposition testimony and affidavits" was sufficient adjudication on the merits to trigger AEDPA deference).[18]

---

low, this evidence should have been analyzed under § 2254(e)(1) pursuant to the framework set forth in *Taylor v. Maddox,* 366 F.3d 992, 999–1000 (9th Cir.2004), which specifies the standards for review of new evidence raised in a federal evidentiary hearing. Assertion of the privilege in this case simply presents no basis for concluding that the Washington state courts did not adjudicate Lambert's constitutional claims on the merits.

**17.** Because both the Washington Court of Appeals and the Washington Supreme Court reached the merits of Lambert's post-conviction petitions, we analyze the Washington Supreme Court's decision as the relevant state-court determination. However, because the supreme court largely adopted the reasoning of the court of appeals, we also discuss the court of appeals' decision. *Lewis v. Lewis,* 321 F.3d 824, 829 (9th Cir.2003); *see also Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground.").

**18.** A review of the district court's own findings of fact demonstrates that the federal court evidentiary hearing uncovered little new

We, thus, conclude that Washington's adjudication on the merits triggers AEDPA deferential review. We next consider the standard of review for (1) questions of fact, (2) questions of law, and (3) mixed questions of law and fact.

### B. AEDPA Deferential Review

#### 1. AEDPA Review of State Court Fact-finding

AEDPA repealed former § 2254(d) and replaced it with two new provisions dealing with state court factual findings and fact finding procedures, 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1), which provide as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

* * *

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §§ 2254(d)(2), (e)(1) (2003).

Together, these sections address whether, and to what extent, a federal district court is bound by state court findings on any of the dispositive factual questions presented in the habeas corpus petition. Courts and commentators disagree on both what these standards entail and how they interrelate.[19] It is apparent, however, that

---

evidence. Most of the court's conclusions regarding ineffective assistance rely on testimony provided by Romero—evidence that was before both the Washington Court of Appeals and the Washington Supreme Court. The court also relied upon the testimony of Michael Iaria, a criminal defense attorney who, likewise, testified on Lambert's behalf in the state courts. The only new evidence of any real import brought to light in the context of the evidentiary hearing consisted of the enhanced tape-recorded confession, and several notes authored by Lambert prior to and following entry of his guilty plea. Both pieces of evidence were in Lambert's possession prior to the state court proceedings. Although he could have submitted the notes and an expanded affidavit or declaration discussing the enhanced tape-recorded confession, Lambert inexplicably withheld their submission until the federal court evidentiary hearing. The district court excused Lambert's failure to develop the facts surrounding these issues on the ground that he was "denied ... full discovery and an evidentiary hearing." Lambert, 248 F.Supp.2d at 998. The record shows, however, that the true reason was Lambert's choice not to pursue these issues in state court.

19. Some courts have read 28 U.S.C. §§ 2254(d)(2) and (e)(1) independently, simply choosing to apply one standard or the other. See, e.g., Cartalino v. Washington, No. 96–C2269, 1996 WL 634168, at *2 (N.D.Ill. Oct. 30, 1996) (applying § 2254(d)(2)). Others have attempted to reconcile the two provisions using a variety of different approaches. One view posits that § 2254(e)(1) applies to the review of individual historical facts from the extant state court record, whereas § 2254(d)(2) applies to the review of the entire factual basis on which the state court decision rested. Note, Rewriting the Great Writ: Standards of Review for Habeas Corpus, 110 Harv. L. Rev. 1868, 1874 (1997). A more generous interpretation is offered by Professors Liebman and Hertz who suggest that the two sections provide alternative means of granting relief: under § 2254(d)(2) if the finding was procedurally or substantively unreasonable, or under § 2254(e)(1) if the petitioner can demonstrate by clear and convincing evidence that the finding was incorrect. See

under AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller–El,* 537 U.S. at 340, 123 S.Ct. 1029; *see also Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."); *Taylor,* 366 F.3d at 999 ("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable"); *Brown v. Poole,* 337 F.3d 1155, 1160 n. 2 (9th Cir.2003) ("We would indeed defer to all factual findings of the state court that are reasonable 'in light of the evidence presented in the state court proceedings.'") (quoting *Greene v. Henry,* 302 F.3d 1067, 1072 (9th Cir.2002)).

■■■ Furthermore, in *Taylor,* 366 F.3d at 999, we recently held that §§ 2254(d)(2) and (e)(1) apply to challenges supported by separate categories of evidence: the "unreasonable determination" clause of § 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges the state court's findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. *Id.* at 999–1000. Under this bifurcated reading, the unreasonable determination clause of § 2254(d)(2) teaches us that we must be particularly deferential to our state court colleagues. *Id.* at 1000. "[I]t is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision; rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* (citations omitted). Likewise, mere doubt as to the adequacy of the state court's findings of fact is insufficient; "we must be satisfied that *any* appellate court to whom the defect[in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* (emphasis added).

■■■ After surviving this intrinsic review, or where the petitioner does not raise an intrinsic challenge to the state court's findings of fact, the state court's factual conclusions are then "dressed in a presumption of correctness, which[ ] helps steel them against any challenge based on extrinsic evidence." *Id.* Under § 2254(e)(1), state court fact-finding "may be over-turned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id.* (citation omitted).

RANDY HERTZ & JAMES S. LIEBMAN, 1 FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 20.2c (4th ed.2001). Still another approach posits that § 2254(e)(1)'s clear and convincing burden is applicable only when a petitioner has been granted an evidentiary hearing in federal court, and that all other cases must be decided under § 2254(d)(2) on the basis of evidence presented in state court. *See* WAYNE R. LAFAVE, JEROLD H. ISRAEL & NANCY J. KING, CRIMINAL PROCEDURE § 28.7 (2d ed.1999). As we discuss more fully, we recently formulated our own approach to interpreting the two sections, adopting a somewhat modified version of the latter interpretation. *See Taylor,* 366 F.3d at 999–1000.

■ Applying this analysis to Lambert's habeas petition, we are prepared to review the following findings of the Washington state courts: (1) that Lambert understood the mandatory sentence applicable to the charge of aggravated first-degree murder; (2) that he thought for a long time about his decision to plead guilty; (3) that he desired to plead guilty in order to feel better about himself, avoid being labeled a double murderer, and to avoid a prolonged trial in which the State's evidence against him was extremely strong; (4) that a reasonably competent attorney could conclude that Lambert stood to gain some personal advantage by entering the guilty plea he had proposed; and (5) that Romero and Earl were not associated in the same firm. These findings should not be overturned unless they constitute an unreasonable determination of the facts in light of the evidence. Therefore, the district court erred when it disregarded factual findings determined to be "clearly erroneous";[20] it employed the wrong standard of review. *See Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness.").

■ In addition, the new evidence of the enhanced tape-recorded confession and the notes offered by Lambert, both presented only at the federal court evidentiary hearing, cannot be used to overturn the Washington courts' findings unless this new evidence is sufficient to overcome the presumption of correctness accorded state fact-finding. In order to accomplish this, the new evidence must amount to clear and convincing proof that the state court's factual findings are erroneous. To the extent that the district court concluded, based solely on evidence already presented to the Washington state courts, that Lambert had rebutted the state courts' findings by clear and convincing evidence, the court erred. The only evidence eligible to meet the "clear and convincing" burden is new evidence presented exclusively in federal court. *Taylor*, 366 F.3d at 1000.[21]

## 2. AEDPA Review of State Court Legal Conclusions

With respect to questions of law, AEDPA denies habeas relief as to any claim adjudicated on the merits in a state court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This provision modifies the role of federal habeas courts reviewing petitions filed by state prisoners and significantly alters the previously settled rule of independent review of questions of law. *Williams v. Taylor*, 529 U.S. 362, 403–04, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). After the Supreme Court's decision in *Williams*,

---

**20.** We note, initially, that the decision that state fact-finding constitutes an "unreasonable determination of the facts in light of the evidence" is a mixed question of law and fact which we review *de novo. See Pullman–Standard*, 456 U.S. at 289 n. 19, 102 S.Ct. 1781 (characterizing mixed questions of law and fact as those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard").

**21.** We note that *Taylor*, 366 F.3d 992, was not decided until after the district court ruled on Lambert's habeas petition; however, it is well established that a court generally applies the law in effect at the time of its decision, and that if the law changes while the case is on appeal the appellate court applies the new rule. *See, e.g., Thorpe v. Durham Hous. Auth.*, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

§ 2254(d)(1)'s key phrases—"contrary to," and "unreasonable application"—are understood to bear independent meaning as two distinct standards of review. *Id.* at 404, 120 S.Ct. 1495. Both standards are best understood by reference to the key words, "clearly established."

■ "Clearly established" in § 2254(d)(1) " 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.' " *Lockyer,* 538 U.S. at 71–72, 123 S.Ct. 1166 (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. 1495). In other words, "clearly established Federal law" is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer,* 538 U.S. at 72, 123 S.Ct. 1166. The statutory language plainly restricts the source of clearly established law to the Supreme Court's jurisprudence. Thus, "[w]hile circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark,* 331 F.3d at 1069 (internal citation omitted); *see also Dows v. Wood,* 211 F.3d 480 (9th Cir.2000) (adopting reasoning from on-point Ninth Circuit case to help decide habeas petition under AEDPA); *MacFarlane v. Walter,* 179 F.3d 1131, 1134 (9th Cir.1999) (looking to Ninth Circuit case law to confirm that Supreme Court case clearly establishes a legal rule); *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) (holding that "to the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue").

■ A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent. *Lockyer,* 538 U.S. at 73, 123 S.Ct. 1166 (citing *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495). "A run-of-the-mill state-court decision applying the correct legal rule" from Supreme Court jurisprudence "to the facts of a prisoner's case would *not* fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Lockyer,* 538 U.S. at 73, 123 S.Ct. 1166 (emphasis added). The "unreasonable application" standard captures those cases in which "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495 (O'Connor, J., writing for a five-Justice majority).

In *Williams,* the Supreme Court, elaborating on the latter standard, reasoned that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495 (rejecting a subjective analysis which asked merely whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case"). Noting the difficulty and confusion that may accompany the term "unreasonable," the Court emphasized that "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495 (emphases in origi-

nal). While under pre-AEDPA law it was accepted that "federal courts, even on habeas, have an independent obligation to say what the law is," *Wright v. West*, 505 U.S. 277, 305, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), section 2254(d)(1)'s use of the word "unreasonable," rather than "incorrect" or "erroneous," led the Court in *Williams* to conclude that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411, 120 S.Ct. 1495. Rather, the "application must also be unreasonable." *Id.; see also Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166 ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable.") (citation omitted); *Early v. Packer*, 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (AEDPA requires that "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law[.]"); *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (a federal court may not "substitut[e] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); *Penry v. Johnson*, 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) ("[E]ven if the feder-al habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable").[22]

Applying these standards to the analysis provided by the Washington state courts, the following legal conclusions may not be set aside unless they are contrary to, or involve an unreasonable application of, a controlling decision of the United States Supreme Court: (1) that an attorney who holds a contract to provide legal services to indigent defendants does not labor under an actual conflict of interest although he shares an office with the attorney representing his client's co-defendant; (2) that a defendant has not shown the actual prejudice necessary to establish ineffective assistance of counsel in connection with a decline proceeding if the factors outlined in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), all counsel against retaining juvenile jurisdiction; and (3) that a defendant has not shown actual prejudice resulting from counsel's deficient performance in connection with the entry of a guilty plea if the defendant was advised of and understood the consequences of his plea, was advised that he would obtain no legal benefit by pleading guilty, and, yet, chose to do so anyway, articulating his own personal reasons for pleading guilty.

To the extent that the district court set aside state legal conclusions found to be "clearly erroneous," the district court

---

**22.** We previously required federal habeas courts to review the state court's decision *de novo* before applying AEDPA's standard of review. *See, e.g., Van Tran v. Lindsey*, 212 F.3d 1143, 1154–55 (9th Cir.2000); *Clark*, 317 F.3d at 1044 n. 3. The Supreme Court has expressly disapproved of our approach. *See Lockyer*, 538 U.S. at 71, 123 S.Ct. 1166 ("AEDPA does not require a federal habeas court to adopt any one methodology in decid-ing the only question that matters under 2254(d)(1)—whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law. In this case, we do not reach the question whether the state court erred and instead focus solely on whether 2254(d) forecloses habeas relief on [the petitioner's constitutional] claim.") (internal citation omitted).

erred. This error is magnified by the district court's citation to our decision in *Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir.2000). We note that the Supreme Court has specifically rejected the approach forged in *Van Tran*, stating, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." *Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166. The portion of our opinion in *Van Tran* relying upon a clearly erroneous standard is no longer good law, and the district court erred when it employed this standard to review Lambert's habeas petition.

### 3. AEDPA Review of Mixed Questions of Law and Fact

The Supreme Court has noted on several occasions that the rules governing state court findings of fact in the former § 2254(d) applied only to a state court's determination of "historic fact" as opposed to a "mixed determination of law and fact that requires the application of legal principles to the historical facts." *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). AEDPA appears to maintain this distinction, using essentially the same language. *Compare* 28 U.S.C. § 2254(d)(1) (2003) (using the words "determination of a factual issue"), *with* 28 U.S.C. § 2254(d) (1995) (using the words "determination of the facts"). Thus, we have held that, like its predecessor, former § 2254(d), the reach of the presumption of correctness in new § 2254(e)(1) is restricted to pure questions of historical fact. State decisions applying law to facts are governed by § 2254(d)(1); however, factual findings underlying the state court's conclusion on the mixed issue are accorded a presumption of correctness. *See Jeffries v. Wood*, 114 F.3d 1484, 1498 (9th Cir.1997) (AEDPA "restricts the scope of federal review of mixed questions of fact and law.

De novo review is no longer appropriate; deference to the state court factual findings is.") (internal citation omitted); *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir.1997) (voluntariness of confession is a legal question not entitled to presumption of correctness but the state court's finding that no threats or promises were made in connection with the confession was "essentially a factual conclusion, which is entitled to a presumption of correctness"); *see also Long v. Krenke*, 138 F.3d 1160 (7th Cir. 1998); *Davis v. Johnson*, 158 F.3d 806 (5th Cir.1998).

■■■■ Forging the precise distinction between a "factual" and a "mixed" determination has proven difficult and contentious. *Miller v. Fenton*, 474 U.S. 104, 113, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (explaining that the "appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive" and that the difficulty is compounded by considerations of allocation and judicial efficiency). In general, an issue that involves inquiry into a state of mind may be considered a question of fact. *Id.* "[A]n issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." *Id.* Nonetheless, over the years courts have had occasion to address the classification and treatment—either as factual, legal or mixed—of several of the claims forming the basis of this appeal.

■■■■ In *Marshall v. Lonberger*, 459 U.S. 422, 431–32, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), the Supreme Court held that the state court's factual determinations, fairly supported by the record, regarding the voluntariness of the defendant's guilty plea in a prior proceeding, were entitled to a presumption of correctness because the findings were based on the state court's determination of the defendant's credibility

during his testimony before the court. The Court also noted, however, that the standard of whether the plea is voluntary is a question of federal law, and not a question of fact subject to the former § 2254(d). *Id.* ("[T]he governing standard as to whether a plea of guilty is voluntary for purposes of the Federal Constitution is a question of federal law, and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d). But the questions of historical fact which have dogged this case from its inception—what the Illinois records show with respect to respondent's 1972 guilty plea, what other inferences regarding those historical facts the Court of Appeals for the Sixth Circuit could properly draw, and related questions—are obviously questions of 'fact' governed by the provisions of § 2254(d).").[23] Similarly, although the presumption of correctness does apply to state court findings of fact made in the course of resolving claims of ineffective assistance of counsel, it does not apply to state court conclusions regarding claims of ineffective assistance. *See Strickland,* 466 U.S. at 698, 104 S.Ct. 2052 (within ineffective assistance of counsel claim, issues of counsel's performance and defendant's prejudice are mixed questions of law and fact not entitled to presumption of correctness).[24]

Consequently, a federal court reviewing a state court conclusion on a mixed issue involving questions both of fact and law must first separate the legal conclusions from the factual determina-

---

**23.** We, and other courts, have held similarly. *See, e.g., Rupe,* 93 F.3d at 1444 (voluntariness of confession is a legal question not entitled to presumption of correctness but the state court's finding that no threats or promises were made was "essentially a factual conclusion, which is entitled to a presumption of correctness"); *Iaea v. Sunn,* 800 F.2d 861, 864 (9th Cir.1986) ("Findings of historical facts underlying a court's conclusion of voluntariness [of a guilty plea] are given deference in a habeas proceeding"); *Wellman v. Maine,* 962 F.2d 70, 72 (1st Cir.1992) (voluntariness of guilty plea is mixed question of law and fact not entitled to presumption of correctness); *Matusiak v. Kelly,* 786 F.2d 536, 544 (2d Cir.1986) (same); *Parry v. Rosemeyer,* 64 F.3d 110, 113 (3d Cir.1995) (same); *Savino v. Murray,* 82 F.3d 593, 603 (4th Cir.1996) (same); *Muniz v. Johnson,* 132 F.3d 214, 219 (5th Cir.1998) (voluntariness of confession reviewed *de novo* using presumptively correct state court findings); *Sprosty v. Buchler,* 79 F.3d 635, 646 (7th Cir.1996) (voluntariness of confession is legal question not entitled to presumption of correctness); *Reese v. Delo,* 94 F.3d 1177, 1183 (8th Cir.1996) (voluntariness of confession is mixed question of law and fact not entitled to presumption of correctness); *Trice v. Ward,* 196 F.3d 1151, 1169 (10th Cir.1999) (subsidiary findings of fact leading to conclusion of voluntariness of confession are entitled to presumption of correct-

ness but ultimate question of voluntariness is not); *Baldwin v. Johnson,* 152 F.3d 1304, 1311 (11th Cir.1998) (voluntariness of petitioner's statement presents legal question not entitled to presumption of correctness, but deference is accorded to underlying factual findings of state court). *But see Gomez v. Ahitow,* 29 F.3d 1128, 1134 (7th Cir.1994) (voluntariness of waiver of right to conflict-free counsel is question of fact; therefore, state court finding is entitled to presumption of correctness).

**24.** Here, again, we and other courts have followed suit. *See, e.g., Seidel v. Merkle,* 146 F.3d 750, 753 (9th Cir.1998) (while court will presume factual findings are correct, ineffective assistance of counsel was mixed question of law and fact not entitled to presumption of correctness); *Jackson v. Byrd,* 105 F.3d 145, 147 (3d Cir.1997) (while court will presume factual findings are correct, ineffective assistance of counsel was mixed question of law and fact not entitled to presumption of correctness); *Crane v. Johnson,* 178 F.3d 309, 312 (5th Cir.1999) (same); *Gonzales v. McKune,* 247 F.3d 1066, 1072 (10th Cir.2001) (same); *Baldwin v. Johnson,* 152 F.3d 1304, 1311 (11th Cir.1998) (same); *Curtis v. Duval,* 124 F.3d 1, 3 (1st Cir.1997) (ineffective assistance of counsel claim presents mixed question of law and fact not entitled to presumption of correctness).

tions that underlie it. Fact-finding underlying the state court's decision is accorded the full deference of §§ 2254(d)(2) and (e)(1), while the state court's conclusion as to the ultimate legal issue—or the application of federal law to the factual findings—is reviewed per § 2254(d)(1) in order to ascertain whether the decision is "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Thus, the state court's conclusions that (1) Romero did not labor under an actual conflict of interest; (2) Lambert was not prejudiced by Romero's alleged ineffective assistance in connection with the decline proceeding; (3) Lambert was not prejudiced by Romero's alleged ineffective assistance in connection with his guilty plea; and (4) Lambert's guilty plea was voluntary, knowing and intelligent, may be overturned only if they are contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent. The factual findings supporting those conclusions are accorded full AEDPA deference.

In sum, AEDPA has fostered a complex, yet indisputably deferential, system of federal habeas review. That we have AEDPA proves that there is an important role for federal courts to check state court decisions. That AEDPA requires such deference to state courts demonstrates that, as federal courts, we may not reopen the judgments of state courts except on the terms specified by Congress; again, we may not review state court judgments on the same terms as we do for direct appeals. We summarize the layers of review mandated by AEDPA as follows: First, challenges to purely factual questions resolved by the state court are reviewed under § 2254(d)(2); the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding

is supported by the record. Second, fact-based challenges founded on evidence raised for the first time in federal court are reviewed under § 2254(e)(1); the question on review is whether the new evidence amounts to clear and convincing proof sufficient to overcome the presumption of correctness given the state court's factual findings. Third, challenges to purely legal questions resolved by the extant state court are reviewed under § 2254(d)(1); the question on review is (a) whether the state court's decision contradicts a holding of the Supreme Court or reaches a different result on a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court; or (b) whether the state court, after identifying the correct governing Supreme Court holding, then unreasonably applied that principle to the facts of the prisoner's case. And, fourth, challenges to mixed questions of law and fact receive similarly mixed review; the state court's ultimate conclusion is reviewed under § 2254(d)(1), but its underlying factual findings supporting that conclusion are clothed with all of the deferential protection ordinarily afforded factual findings under §§ 2254(d)(2) and (e)(1). While this scheme is complex, it is not toothless. "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable." *Miller–El,* 537 U.S. at 340, 123 S.Ct. 1029. In fact, as we have noted, the Supreme Court and each of the circuits have all found AEDPA's standard of review satisfied. *See Taylor,* 366 F.3d at 1000 (collecting cases).

It remains to apply AEDPA to each of the claims forming the basis of this appeal.

## III. GROUNDS FOR APPEAL

Both parties to this appeal claim that the district court erred, albeit on different

grounds. Beginning with the state of Washington, we shall address each party's claims in turn.

## A. *Washington's Claims on Appeal*

 The state of Washington, through Warden James Blodgett, asserts, *inter alia,* the following grounds for error: (1) the district court erred in determining that Lambert's guilty plea was not voluntary, knowing and intelligent, and (2) the district court erred in determining that Romero's representation of Lambert in connection with his guilty plea was ineffective.

Although Lambert's habeas petition styles the arguments attacking his guilty plea and those faulting Romero's representation in connection with its entry as two separate theories supporting habeas relief, Lambert's unconditional guilty plea limits the grounds upon which he can subsequently challenge his detention. The Supreme Court has stated that "[w]here, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.... [A] defendant who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was [ineffective].'" *Hill v. Lockhart,* 474 U.S. 52, 56–57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (quoting *Tollett,* 411 U.S. at 267, 93 S.Ct. 1602) (internal quotation marks and citation omitted). Because Lambert pled guilty upon the advice of counsel, he is limited to challenging his plea by demonstrating that the advice he received from counsel did not constitute effective representation. *See also Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ("Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion...."); 24 MOORE'S FEDERAL PRACTICE— CRIMINAL PROCEDURE § 611.08 (1997) ("If the defendant is represented by reasonably competent counsel, ... [he] will typically be precluded from raising the issue of the voluntary and intelligent nature of the plea. This is so, even if accurate knowledge would have caused the defendant not to plead guilty.").

In his habeas petition, Lambert alleges that he was provided ineffective assistance because his attorney, Romero, failed to offer the required advice prior to the entry of his plea. He claims that Romero failed to inform him that his plea, which carried a mandatory punishment of life without parole, literally meant that he would spend the rest of his life in prison, and failed to advise him that a guilty plea carried no advantage. Lambert's habeas petition also alleges that his plea was rendered involuntary because his counsel failed to investigate certain evidence prior to its entry. Specifically, he argues that Romero should have uncovered evidence that he was exposed to alcohol in utero, that several of the witnesses scheduled to testify against him had extensive criminal records, and that his tape-recorded confession had been "enhanced."

We proceed to address both claims of ineffective assistance.

### 1. Failure to Advise

 In the context of a guilty plea, the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the defendant's ability to enter an intelligent, knowing and voluntary plea of guilty. To succeed, the defendant must show that counsel's assistance was not

within the range of competence demanded of counsel in criminal cases and that the defendant suffered actual prejudice as a result. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59, 106 S.Ct. 366.

The Washington courts each addressed Lambert's ineffective assistance of counsel claims at length under the standards set forth in *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, and *Hill,* 474 U.S. 52, 106 S.Ct. 366. Both courts concentrated their inquiry on ascertaining whether Lambert fully understood the punishment attaching to his plea, presumably because this knowledge would tend to undercut Lambert's assertion that prejudice flowed from Romero's allegedly ineffective advice; if Lambert chose to plead guilty of his own accord and for his own reasons, with full knowledge of the consequences of his plea, it is unlikely that Romero could have provided any information which would have dissuaded him. Based on the record and the evidence presented in state court, both the Washington Court of Appeals and the Washington Supreme Court found that Lambert was aware of the consequences of his plea, that he understood that the court had no discretion as to punishment, that Romero informed him that he would not gain any advantage by pleading guilty, that Lambert thought about pleading guilty for a long time, and that he ultimately chose to do so in order to "feel better about himself" and to resolve the matter. On the basis of these findings, the Washington courts concluded that Lambert failed to

establish prejudice as required by *Strickland.* Because Lambert fully understood the consequences of his plea, his bare allegation that he would not have pled guilty if Romero had strongly opposed his decision was insufficient, in the courts' view, to establish the required prejudice.

These findings are supported by the evidence presented in state court. The evidence demonstrated that Lambert's choice to plead guilty was not impulsive; he had been thinking about it "for quite sometime [sic]." His own statements showed that he was motivated by a desire to avoid being labeled a double murderer and undergoing a prolonged trial in which the evidence against him was unquestionably strong, as well as an emotional need to take responsibility for his crime. The state trial court judge confirmed that Lambert understood that he would receive a sentence of life in prison without the possibility of parole, emphasizing that the provision of the plea agreement detailing community placement did not apply because he would never be released to the community. Having reviewed the record, we cannot conclude that the state courts acted unreasonably or contrary to controlling Supreme Court precedent.

 We must next ascertain whether the new evidence presented at the federal evidentiary hearing is sufficient to establish by clear and convincing proof, that Lambert's plea was rendered involuntary by virtue of Romero's allegedly ineffective representation. Reviewing the district court's conclusion *de novo,*[25] we hold that the evidence presented was insufficient to meet the burden of proof imposed by AEDPA.

---

**25.** Because it is a mixed question of law and fact, we review the district court's conclusion that its factual findings are "clear and convincing" proof sufficient to rebut the presumptively correct state court's fact-finding *de novo. See Pullman–Standard,* 456 U.S. at 289 n. 19, 102 S.Ct. 1781.

The district court rejected the state courts' findings and conclusions, determining, initially, that the state courts did not comment on Romero's failure to advise Lambert on whether he should plead guilty. We note that the Washington Court of Appeals found that Romero did, in fact, inform Lambert that he would not gain any advantage by pleading guilty. Any evidence to the contrary is not clear and convincing. The district court erred when it failed to observe this finding.

 After disregarding the Court of Appeals' contrary findings, the district court made findings of its own: that Lambert did not understand the law in relation to the facts; he did not know his sentence would be the same by pleading guilty to one count of aggravated first-degree murder as it would if he went to trial and was convicted of two counts; he was not fully aware of the direct consequences of his plea because he thought his sentence would be equivalent to twenty years; and he was not aware that the prosecutor's dismissal of one aggravated first-degree murder count had absolutely no value to him. *Lambert,* 248 F.Supp.2d at 1007–08. On this basis, the district court concluded that Lambert did not receive reasonably competent advice and his plea was, therefore, involuntarily rendered. *Id.* at 1008.[26]

The district court's conclusions are not supported by the record. Accepting wholesale the self-serving testimony offered by Lambert at the federal evidentiary hearing, the court overlooked two pieces of evidence which objectively contradict this testimony. In the note authored by Lambert prior to his trial, on October 14, 1997, he admits his knowledge of the punishment he faced, stating, "if I lose my trial I face life in prison without parole," and continuing, "to me I would

---

**26.** In his initial habeas petition Lambert primarily sought to attack his plea as involuntary simply because he misunderstood his eligibility for parole. As noted previously, Lambert is restricted to attacking the voluntariness of his plea by establishing that he was not provided the effective assistance of counsel. While we conclude that the state courts reasonably found that Lambert was provided the effective assistance of counsel and, further, that he actually understood his sentence, we note that the Supreme Court has never held that the United States Constitution requires furnishing a defendant with information about parole eligibility in order for a guilty plea to be deemed voluntary. *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *see also Spinelli v. Collins,* 992 F.2d 559, 561 (5th Cir.1993) (where a petitioner's mistaken belief about parole eligibility was not based on any promise by the defense attorney, the prosecutor, or the court and the petitioner understood the maximum sentence he could receive, the guilty plea should not be set aside); *United States v. Storey,* 990 F.2d 1094, 1096–98 (8th Cir.1993) (concluding that guilty plea advice was not ineffective assistance even though counsel erroneously informed defendant that she would be eligible for pa-

role because the petition to enter a plea of guilty specified that defendant would not be eligible for parole); *United States v. Gavilan,* 761 F.2d 226, 228–29 (5th Cir.1985) (concluding that counsel's failure to advise defendant of collateral effects of guilty plea was not ineffective assistance because defendant failed to demonstrate that he would have pled differently). A guilty plea, with its attendant waiver of rights, may be upheld "despite various forms of misapprehension under which a defendant might labor." *United States v. Ruiz,* 536 U.S. 622, 630, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (citing *Brady,* 397 U.S. at 757, 90 S.Ct. 1463) (defendant "misapprehended the quality of the State's case" and "the likely penalties," and failed to "anticipate" a change in the law regarding relevant "punishments"); *United States v. Broce,* 488 U.S. 563, 573, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (counsel failed to point out a potential defense); *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (counsel failed to find a potential constitutional infirmity in ·grand jury proceedings); *McMann v. Richardson,* 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (counsel "misjudged the admissibility" of a "confession").

rather prefer the death penalty [sic] and just get everything out of the way instead of sitting and rotting in a cell just waiting to die anyway." "Sitting and rotting in a cell just waiting to die" are not the words of a 16–year–old who believed he would only remain in prison until his 36th birthday. Furthermore, on the day he entered his plea, Lambert wrote, "Today is the day I took responsibility for my actions, it is also the day I start my life in prison." Instead of confronting or explaining this evidence, the district court found conclusive the ambiguous scribbling in the margin of a note Lambert passed to Romero before they discussed his plea. Concluding that this established Lambert's confusion as to the punishment he faced, the district court ignored a simple and obvious fact: this note was written prior to Lambert's discussion with Romero regarding the consequences of his plea, before Lambert read aloud and filled out the written guilty plea statement, and before the trial judge's guilty plea colloquy with Lambert. Any latent confusion expressed in the note must be considered in the context of the entire guilty plea proceeding. *Brady*, 397 U.S. at 749, 90 S.Ct. 1463. When considered in this light, the note does not amount to clear and convincing proof that the state courts erred.

 Thus, considering all of the evidence, we conclude that the district court erred when it determined that the extrinsic evidence presented at the federal evidentiary hearing constituted "clear and convincing evidence" sufficient to overturn the state courts' findings of fact.[27] The presumption of correctness stands. The district court failed to accord the deference required by AEDPA when it rejected the state courts' conclusion. Accordingly, the judgment of the district court, granting Lambert's habeas petition on the ground that his guilty plea was not voluntary, knowing and intelligent, must be reversed.

### 2. Failure to Investigate

 Where the alleged error is counsel's failure to investigate a potential defense, the salient inquiry is whether "discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59, 106 S.Ct. 366. In turn, the result of this inquiry may depend on whether "the[ ] defense would have likely succeeded at trial." *Id.* This is an objective analysis that requires us to examine what a reasonable person would do "without regard for the 'idiosyncrasies of the particular decisionmaker.'" *Id.* at 60, 106 S.Ct. 366 (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). Courts have generally rejected claims of ineffective assistance premised on a failure to investigate where the record demonstrates that the defendant would have pled guilty despite the additional evidence and where the additional evidence was unlikely to change the outcome at trial. *See, e.g., Hill*, 474 U.S. at 56, 106 S.Ct. 366 (finding no actual prejudice and declining to reach the question of whether counsel's erroneous advice regarding eligibility for parole under proffered plea bargain would satisfy the first prong of the *Strickland* test because the defendant failed to allege that he would have pled differently but for the erroneous advice); *Langford v. Day*, 110 F.3d 1380, 1388 (9th Cir.1996) (denying

---

**27.** The district court at times held that the state courts' contradictory findings were "clearly erroneous," and at other times stated that Lambert had proven the error of such findings by clear and convincing evidence. *Lambert*, 248 F.Supp.2d at 1008. As noted previously, the state courts' factual determinations are presumed correct; this presumption can only be rebutted by clear and convincing evidence. The gloss of "clear error" has no place in this analysis. *Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166.

claim of ineffective assistance of counsel on the ground that the record supported the state court's finding that even if the petitioner had been offered a defense psychiatrist, he would have pled guilty anyway); *Mitchell v. Scully*, 746 F.2d 951, 955 (2d Cir.1984) (per curiam) (finding no prejudice and guilty plea voluntary where counsel allegedly failed to inform defendant of affirmative defense that had little chance of success and entailed serious risks).

Concluding that the state courts' findings and conclusions were unworthy of deference because neither the Washington Court of Appeals nor the Washington Supreme Court commented on the portion of *Strickland* explaining a counsel's duty to investigate, the district court simply replaced the state courts' findings with its own: Romero's conduct fell below the objective standard of reasonableness because he failed to "(1) hire an investigator and/or investigate Mr. Lambert's background, including his alcohol exposure in utero, and the background of his co-defendants, who were to testify against him, for impeachment material; (2) review discovery to learn of the enhanced tape recording of Mr. Lambert's taped statement; and (3) compare the tape recording to the transcript and discover the significant transcription error attributing a false admission of premeditation to Mr. Lambert." *Lambert*, 248 F.Supp.2d at 1000.

The record demonstrates that the evidence supporting these findings was not presented to the state courts. The framework set forth in *Taylor*, 366 F.3d 992, implicitly assumes that new evidence may be heard for the first time in federal court. Under this framework, the new evidence of ineffectiveness does not, by itself, permit us to disregard the state court's findings and conclusions. Rather, this new evidence must establish by clear and convincing proof the error of the state court's

factual findings in order to overcome the presumption of correctness those findings enjoy.

As noted by the Washington state courts, the record demonstrates that Romero retained Dr. Mays to evaluate Lambert, and, finding no basis for a mental defense, Mays concluded that he was competent to stand trial and had no severe mental illness. In fact, three separate mental health experts determined that Lambert had no mental defense. Nevertheless, based on Mr. Iaria's testimony at the federal evidentiary hearing, the district court concluded that Romero failed to provide Dr. Mays with sufficient information to investigate a defense of fetal alcohol syndrome ("FAS"). Yet, we have only imposed this particular obligation in the penalty phase of capital cases. Neither this circuit, nor the Supreme Court, has ever imposed such an obligation in noncapital cases. *See Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (concluding that counsel's failure to adequately investigate prior to deciding not to introduce mitigating evidence in capital case constituted ineffective assistance); *Williams*, 529 U.S. at 397, 120 S.Ct. 1495 (concluding that counsel's failure to introduce the voluminous evidence of defendant's "nightmarish childhood" was ineffective assistance in a capital trial); *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir.2004) (finding duty to investigate aggravating circumstances presented by prosecution in penalty phase of capital case); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir.1999) (finding a duty to investigate possible mental defense at sentencing phase of capital case); *Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) (concluding that attorney's failure to investigate rendered the penalty phase of capital case unreliable); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1037–39 (9th Cir.1995) (concluding that in the guilt

phase, defendant's counsel was entitled to rely on the shared and unqualified opinion of his two mental health experts that his client was sane).

Additionally, the district court did not even discuss the alleged prejudice which resulted from Romero's failure to uncover evidence tending to establish that Lambert is afflicted by FAS. To find prejudice under these circumstances would require the district court to conclude that the discovery of FAS evidence would have led Romero to change his recommendation as to the plea, which, in turn, depends on the likelihood that a defense premised on FAS would have succeeded at trial. *Hill*, 474 U.S. at 59, 106 S.Ct. 366. Given the overwhelming evidence of guilt and the conclusions of the mental health experts, there was little chance that a defense based upon FAS would have succeeded. The slim potential for success renders highly doubtful any conclusion that Lambert suffered prejudice because his attorney failed to uncover evidence of FAS.

The district court similarly failed to discuss the alleged prejudice resulting from Romero's failure to uncover the background of Lambert's co-defendants, who were scheduled to testify against him, for impeachment material. The court's failure is compounded by the fact that the Washington Supreme Court did, in fact, consider Romero's duty to investigate Betancourt's criminal history, and concluded that Lambert was not prejudiced in light of the overwhelming weight of the evidence against him. The district court erred when it failed to note this conclusion and accord it proper deference under AEDPA.

The district court also erroneously concluded that Lambert received ineffective assistance because Romero did not discover an error in the transcription of two words in Lambert's 52–page taped confession. *Lambert*, 248 F.Supp.2d at 1000.

We note that Lambert's current attorneys—who were made aware that Detective Matney had re-recorded, or "enhanced," the original taped confession at a higher volume so that the voices would be audible—likewise failed to discover any mistranscription until long after the filing of Lambert's habeas petition. Arguably, counsel's actions, while the fit subject for responsible scrutiny and critical review, do not constitute ineffective assistance.

While we express doubt as to whether Romero's failure to uncover the transcription error falls below the objective standard of reasonableness, we find this inquiry irrelevant given the overwhelming evidence of premeditation. Indeed, the most damaging evidence of premeditation was expected to come from Hinkle, who alleged that Lambert had planned for several weeks to rob and kill the Smithsons. Moreover, Lambert's own confession, properly transcribed, tends to support premeditation, as he reported that upon reaching the Smithsons' home he proceeded immediately to their shed to obtain ammunition for his gun.

Reviewing *de novo* the district court's conclusion that the standards set forth in AEDPA are met, we conclude that it erred in determining that the new evidence presented at the federal evidentiary hearing constituted clear and convincing proof sufficient to rebut the state courts' factual findings regarding Romero's failure to investigate. Accordingly, we find that the district court erred in granting habeas relief on this ground. The district court's decision granting habeas relief must be reversed.

Because we conclude that the district court erred in granting habeas relief, we find it unnecessary to address the State's remaining claims of error.

B. *Lambert's Claims on Cross–Appeal*

 In his cross-appeal, Lambert alleges that the district court erred when it rejected his claims of ineffective assistance premised on an actual conflict of interest and Romero's allegedly inadequate representation in conjunction with the decline proceedings. We review each claim *de novo* and, as to both, affirm the decision of the district court.

### 1. Actual Conflict of Interest

Lambert appeals the district court's denial of his ineffective assistance of counsel claim premised on the allegation that Romero labored under an "imputed" conflict of interest. The state courts rejected this claim, finding that Romero merely held an independent contract to provide indigent legal services, and was not associated in the same firm as the attorney representing Lambert's co-defendant. The district court rejected this finding, concluding that Earl and Romero were associated in the same firm, but it nonetheless held that the imputed disqualification rule does not constitute clearly established Supreme Court precedent. Accordingly, the district court concluded that the state courts' dismissal of this claim was neither a violation of, nor an unreasonable application of, clearly established federal law. The district court's conclusion on this issue presents a mixed question of law and fact which we review *de novo*. *See Pullman–Standard*, 456 U.S. at 289 n. 19, 102 S.Ct. 1781.

 Nonetheless, we hold that the district court did not err when it rejected the state courts' factual findings. As noted previously, when conducting an intrinsic review of state court fact-finding, the facts so found must remain undisturbed unless they represent an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2). The state courts found that Romero and Earl maintained separate law offices, employed different clerical workers, kept separate files, did not share a bank or trust account, and maintained their own business cards and letterhead. Citing the standards set forth in *Burger*, 483 U.S. at 783, 107 S.Ct. 3114; *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; and *Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708, both the Washington Court of Appeals and the Washington Supreme Court concluded that no actual conflict of interest impaired Lambert's defense.

In the federal evidentiary hearing, the district court uncovered evidence that Romero and Earl had, in fact, discussed Lambert's case, although it found no evidence that they shared confidences regarding the case management. The court also determined that the two were associated in the same firm. The findings supporting the latter conclusion were as follows:

(1) there was a single "boss," Douglas Earl, who could terminate the contract with the attorneys at any time and not pay them.

(2) The attorneys were paid out of Douglas Earl's account.

(3) There was a single investigator for the group of attorneys.

(4) Douglas Earl handled client complaints made against THE DEFENDERS.

(5) Tom Earl, one of the senior attorneys, supervised the *other* attorneys and reported concerns to Douglas Earl, at one time recommending that Guillermo Romero be terminated for poor performance.

(6) When Guillermo Romero was suspended from the practice of law, other attorneys in The Defenders received the cases that would otherwise have been assigned to Mr. Romero.

(7) Office space was shared at one location with Thomas Earl and Guillermo Romero having offices across the hall from each other. Mr. Romero did not maintain any other legal office.

(8) The sign outside the building said "Grant County Public Defenders."

(9) The office equipment was shared by the attorneys, including the copier, the fax machine, and the computer.

(10) The secretarial services were shared by the attorneys.

(11) The case files were prepared by the shared secretary and retained by Earl & Earl.

(12) Business cards were prepared for the attorneys noting "The Defenders," although Douglas Earl thought that they were not used. David Boerner's expert opinion, [adopted by the district court], was that THE DEFENDERS was a firm for conflict analysis.

*See Lambert,* 248 F.Supp.2d at 1014. We hold that the district court's findings were sufficient to establish, by clear and convincing evidence, the error of the state courts' factual findings.

The district court also held that the imputed disqualification rule is not clearly established federal law for purposes of § 2254(d)(1). We agree.

The merits of Lambert's imputed disqualification claim are not squarely governed by a holding of the Supreme Court. The district court correctly notes that the Supreme Court has never applied the ethical imputed disqualification rule in Sixth Amendment analysis. *Lambert,* 248 F.Supp.2d at 1006. To the contrary, even after assuming—without deciding—that "two law partners are considered as one attorney," the Supreme Court has nonetheless concluded that " '[r]equiring or permitting a single attorney to represent codefendants ... is not per se violative of

constitutional guarantees of effective assistance of counsel.' " *Burger,* 483 U.S. at 783, 107 S.Ct. 3114 (quoting *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). The Court in *Burger,* 483 U.S. at 784, 107 S.Ct. 3114, rejected a rule that would presume a conflict of interest in such situations, in favor of a presumption "that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." Using the normal rules applicable to claims of ineffective assistance of counsel due to a conflict of interest, the Court in *Burger* held that counsel was not burdened by an actual conflict of interest where the attorney representing the petitioner's co-defendant prepared the appellate briefs for both the petitioner and his co-defendant, the attorney failed to argue certain mitigating evidence in the petitioner's brief although he had relied on such evidence at trial, and the two co-defendants asserted inherently inconsistent defenses. *Id.* at 783–89, 107 S.Ct. 3114.

Similarly, in *Holloway,* the Court emphasized that, "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel." 435 U.S. at 482, 98 S.Ct. 1173. The Court continued, noting that "in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation." *Id.*

Lambert's representation by Romero, even in light of his association with The Defenders, fell far short of joint representation. Indeed, in this case, the district court uncovered no evidence suggesting that Romero and Earl ever shared confidences regarding the management of Lambert's or Betancourt's cases. Under these circumstances, we cannot say that either

the Washington courts or the district court unreasonably failed to extend the Sixth Amendment right to conflict-free counsel to this context. *Cf. Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004) (noting that "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt," but concluding that the case did not present such a situation).

The district court's decision dismissing Lambert's conflict of interest claim must be affirmed.

### 2. Decline Proceedings

 Lambert also appeals the district court's denial of his claim that Romero provided ineffective assistance during the declination proceedings and transfer of the case to adult court. The state appellate courts rejected this claim on the ground that there was no probability that, applying the factors set forth in *Kent v. United States,* 383 U.S. at 566–67, 86 S.Ct. 1045, defense counsel would have been successful in opposing the transfer. The district court found this claim precluded in light of Lambert's guilty plea in adult court. *See Lambert,* 248 F.Supp.2d at 999–1000 (citing *Tollett,* 411 U.S. at 266, 93 S.Ct. 1602 (guilty plea foreclosed independent inquiry into defendant's jury selection claim); *Rodriguez,* 798 F.2d at 1252 ("a guilty plea in adult court waives defects in a juvenile fitness hearing")). We conclude that the district court did not err in so finding, and we affirm the district court's decision denying habeas relief on this ground.

### IV. CONCLUSION

While habeas relief is essential to our constitutional scheme of protecting against unlawful detention, Congress has made clear in AEDPA that the writ is not to be used as "a second criminal trial" in which federal courts "run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams,* 529 U.S. at 383, 120 S.Ct. 1495 (opinion of Stevens, J.).

Because the district court's decision fails to accord the deference required by AEDPA, the decision of the district court granting habeas relief is REVERSED and the case is REMANDED for proceedings not inconsistent with this opinion. The decision of the district court on the cross-appeal denying habeas relief is AFFIRMED.